BURR vs. BURTON AS AD.

The sworn denial in the answer of matters charged in the bill to be within the personal knowledge of the defendant, should be overturned by the testimony of two opposing witnesses, or one with strong corroborating circumstances. (5 *Ark. Rep.* 501; 1 *Eng. Rep.* 309.)

A contract made by a party under compulsion, amounting to duress, either by actual violence or threat, is void; but duress by threats, to render a contract void, must be such as to excite a fear of some grievous wrong, as of death, or great bodily harm, or unlawful imprisonment. So, where two partners disagreed about the terms of dissolution and settlement of their partnership affairs—quarreled about it—and one of them, through the intervention of friends, executed certain notes to the other for the purchase of his interest, though he may have been induced to execute the

notes for the purpose of closing the matter and getting clear of his partner, yet having voluntarily done so he was under no such compulsion as would constitute duress in a legal sense.

*Quere:* Where upon a dissolution of a partnership, the terms are reduced to writing, and the purchasing partner executes his notes to the retiring partner for the amount agreed upon to be paid him, can the former set up an unwritten agreement that the payment to the latter was to be contingent upon the result of the closing up of the partnership affairs?

Where a bill or answer contains scandalous and impertinent matter, the opposite party should except thereto and cause it to be expunged: that counsel had fallen into a loose and improper practice as to such matter, or that the complainant's bill contains scandalous and impertinent matter, is not a very satisfactory reason for disallowing exceptions to an answer for scandalous and impertinent matter, that should not be permitted to stain the records of a tribunal of justice.

The complainant in a bill in chancery has no right to complain that the Circuit Court dissolved his injunction with damages, on the coming in of the answer, where upon the final hearing it appears that he was not entitled to an injunction.

*Appeal from the Circuit Court of Independence co., in Chancery.*

The Hon. BEAUFORT H. NEELY, Circuit Judge.

WATKINS & GALLAGHER for the appellants.

FOWLER & STILLWELL for the appellee.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

On the 30th of December, 1850, Edwin T. Burr executed to Philip P. Burton, three promissory notes for $1000 each, payable one, two and three years from date. In July 1851, Philip P. Burton died, and his father, Patrick P. Burton, was afterwards appointed his administrator, being his sole heir and distributee. On the 7th of July, 1853, he, as such administrator, brought an action of debt against Burr, on the two notes first due, in the Independence Circuit Court; and on the 20th March, 1854, recovered judgment for balance of debt $1,640, and $157 30 damages, and for costs. On the 12th January, 1854, Burton, as such administrator, commenced suit against Burr, on the note last due, in the same Court, and on the 20th March of the same year, obtained judgment for $750 residue of debt; $9 35 dam-

ages, and for costs. Executions were issued upon the two judgments, and levied on the property of Burr.

On the 16th of August, 1854, Burr filed a bill against Burton as such administrator, etc., on the chancery side of the Independence Circuit Court, for the purpose of enjoining both of the judgments. The grounds upon which he claims the injunction are substantially as follows:

In the spring of the year 1847, complainant having been engaged for many years in the mercantile business, in Batesville, desired to withdraw ostensibly therefrom, in order to wind up his long unsettled affairs. He also desired to set up in business a confidential clerk named Green F. Shaw, who had served him long and faithfully: and Philip P. Burton, the brother-in-law of complainant. By this, he expected to reap a double benefit: 1st, by advancing the capital for Shaw & Burton, he would derive a proportionate share of the profits of their business; and 2d, Shaw being thoroughly acquainted with the past business of complainant, could afford him material assistance in collecting debts, etc. To accomplish this double purpose complainant advanced to Shaw & Burton, to enable them to carry on business, their whole capital stock, of the value of $10,-000, out of his own means, they being personally unable to obtain means, etc. With the capital so furnished, Shaw & Burton proceeded to carry on business. Complainant not only acted as their agent in purchasing goods for them, but often, to enable them to replenish their stock, became responsible for money borrowed, and merchandise purchased by them, they being without credit, etc.

For a short time, all things betokened prosperity and success; but in the fall of 1847, Philip P. Burton got into a personal difficulty with one *Dr. Aikin,* whom he afterwards killed; and being indicted therefor, the anxiety and restlessness caused by the pendency of a criminal prosecution of such nature unfitted him for business. Besides, Burton having a natural desire to retain friends, conciliate persons not devoted to him, and to avoid offending any who might influence his fate; and knowing that complainant (who was his brother-in-law, and devoted to his

cause) was the person to whom said firm was indebted for its capital, and would regard no sacrifice to protect him, the business of the firm was conducted in a loose and careless manner, and in the sale of the stock on hand, credit was offered and given to any and all persons desiring it. Philip P. Burton gradually became more and more dissipated and inattentive to business; and finally, after his acquittal, in the fall of 1849, the firm of Shaw & Burton being largely indebted, having realized no profits, but suffered heavy losses, was dissolved.

After its dissolution, the business was carried on by Philip P. Burton in his own name, for a few months, upon the remnant of capital stock remaining undisposed of, which complainant had purchased with his own means for the firm of Shaw & Burton, no addition having been made to said stock by Philip P. Burton.

Philip P. became more and more reckless and dissipated, but complainant desiring to reclaim his wife's brother, if possible, in the winter of 1850 formed a partnership with him, for the purpose of carrying on a mercantile business in Batesville. Philip P. advanced no part of the capital stock, and his personal services were of no real advantage, but complainant was actuated in the matter by a desire to redeem him from his course of life; but it was of no avail, his dissipation, etc., increased until he made no distinction between friend and foe, and finally began to manifest inimical feelings towards complainant.

About that time, complainant paid to Shaw $3,000, not on account of any profits or assets of the then late firm of Shaw & Burton, (for *Shaw* admitted that, instead of profits, heavy losses had been sustained by that firm); but solely in payment of long and faithful services rendered by *Shaw* to complainant for a number of years, commencing in 1840, and for which he had never been recompensed.

This act of justice to *Shaw* only increased the personal violence of Philip P. Burton towards complainant; and the former meeting, in his daily walks, persons estranged from him in consequence of his unfortunate difficulty with Dr. Aiken, and his locality in the community becoming unpleasant, he, in the lat-

ter part of the year 1850, proposed to complainant to dissolve all business transactions with each other; and that complainant should take upon himself the burthen of winding up the same; and execute his notes to Philip P. for $3,000. To the first part of the proposition complainant consented, but with the second he refused to comply, representing to Philip P. as a reason therefor, that the firm of Shaw & Burton had lost money; the existing firm of Burr & Burton had not been doing business long enough to make any profits; that business had been dull; losses incurred; that he, Philip P., had in no way contributed to the capital stock of the concern; and was largely indebted to the firm for money and merchandize received by him from it, and appropriated to his individual use, etc. To these representations, Philip P. responded that he knew the firm of Shaw & Burton had sustained heavy losses instead of making profits; and that it was doubtful whether there would be any profits from the business of Burr & Burton when wound up; but that his only motive in demanding said notes of complainant was to show conclusively to the world that he had entirely withdrawn from said firm, and had no further interest in it, or in anything connected therewith. That he had no intention to seek to enforce the payment of the notes until the affairs of the partnerships of Shaw & Burton, and Burr & Burton should be finally wound up; and then if it appeared that there were no profits to be divided, or that he was not entitled to anything over and above what he should be found to be indebted individually to the partnership, he would thereupon cancel and surrender up to complainant his several notes. Philip P. again and again pressed the above proposition upon complainant for his acceptance; and he constantly refused to accede to such portion thereof as required him to execute to the said Philip P. his notes for $3,000, or any other sum. These refusals tended to inflame the already diseased mind of Philip P., and he often broke out in most violent and deadly threats against complainant, to such extent as to alarm many of his friends, and to induce them to believe that the said Philip P. might, (in the paroxysms of his ungovernable anger, laboring under such mental

excitement and disability as he then was,) commit personal vio-
lence upon complainant, and even might take his life. To the
oft·repeated demands of Philip P. that complainant should
comply with his proposition, were joined the entreaties of the
personal friends of complainant, that he should comply there-
with, in order to allay the hostile feelings of said Philip P., inas-
much as it was well known that in the end said notes would
have to be canceled and surrendered up. Complainant was
also advised by counsel, that such being the consideration of
the notes, if upon winding up the partnership concerns there
were no profits to divide, or that the share of Philip P. did not
exceed his indebtedness, etc.; the notes could not be collected,
etc. Thereupon, moved by these considerations, and in order
to avoid all personal difficulty with Philip P., and to allay and
put to rest this family discord and contention, complainant ac-
ceded to the proposition, and it was agreed between him and
Philip P. that the complainant should wind up the business of
the firms of Shaw & Burton and Burr & Burton; that the lat-
ter partnership should be dissolved; that all the assets of both
firms should be transferred to the sole and exclusive use and
benefit of complainant; that he should pay all the debts of the
said partnerships, and pay $2,911 50, borrowed by Philip P. of
his father, Patrick P. Burton, (the defendant,) upon the guaran-
tee of complainant; and pay certain other individual debts
contracted by Philip P., and also make and deliver to him three
promissory notes for $1,000 each, payable at one, two and three
years. And it was further agreed, that when a settlement
should take place between Patrick P. Burton and complainant,
the former being indebted to the latter, the amount found due
should be placed as a credit on the one of said notes last due.
Pursuant to this agreement, complainant did, on the 30th De-
cember, 1850, make and deliver to Philip P. the three notes as
aforesaid; and it was at the time expressly agreed between
them that Philip P. should retain the notes, and make no at-
tempt to enforce the collection thereof until the winding up of
the business of said partnerships; and then if it appeared there
were no profits to divide between them, or that the individual

indebtedness of Philip P. to the partnerships equaled or exceeded his share of the profits, if any, then he should cancel and surrender to complainant the said notes without delay. That the notes so executed are the same notes upon which Patrick P. Burton, as administrator of Philip P., obtained the judgments sought to be enjoined, contrary to the agreement aforesaid, and in fraud of complainant's rights, was attempting to execute the same upon his property, etc.

Complainant further avers that the business of the two firms had not been completely wound up by him, and would not be for a long time, because of the great numbers of bad and doubtful debts, and the necessity of temporizing in the efforts to collect them; but that sufficient had been done to show beyond the shadow of a doubt that there would be no profits arisin therefrom; and that the individual indebtedness of Philip P. to the firms was largely more than any claim of his to assets, etc.; and if his administrator should be allowed, in the teeth of the above agreement, to collect the amount of the judgments upon the notes aforesaid, or any part thereof, it would be a fraud upon complainant, etc. That no other consideration was given for the notes than that above stated, etc.

Complainant also alleges that after the execution of the notes, Philip P. became in various modes indebted to him, over and above the sums credited thereon; but these claims were disputed by the answer, and not proven at the hearing, and therefore the allegations of the bill in reference to them need not be particularly stated.

It is further alleged, that after the death of Philip P. and before administration, the defendant Patrick P. Burton, his father, sole heir, etc., being in possession of the three notes aforesaid, and well knowing that they were executed for the consideration, under the circumstances, and upon the agreement above stated; and being also well aware that upon a final settlement of the partnership concerns aforesaid, nothing would be due to Philip P., etc., promised complainant, of his own free will and accord, to deliver up said three notes to his wife, who was the daughter of said Patrick P., but he afterwards failed to do so.

Again, in July, 1851, said Patrick P. being indebted to complainant in the sum of about $600, for house rent, money loaned, goods, etc., $400 of which was evidenced by note, etc., declared that he would deliver up said three notes to complainant's wife, but in consideration thereof complainant should agree that the debt due from Patrick P. to him should be considered as paid and extinguished. And said Patrick P. moreover stated that inasmuch as complainant would never have to pay any of the balance of said three notes, they should just consider the amount due from him to complainant to be $250, and that he would enter that sum as a credit on the one of the three notes last due; although the amount really due from Patrick P. to complainant was over $600 as above stated. To this proposition complainant consented, and gave up to Patrick P. said note for $400, and considered the whole debt due from him to complainant as extinguished, and said Patrick P. never afterwards paid him one cent thereon, but only credited the one of the said three notes last due with $250, as aforesaid, etc.

That after this agreement with said Patrick P., complainant regarded the whole matter as settled, but in disregard thereof, and in violation of the agreement between Philip P. and complainant, etc., etc., said Patrick P. had afterwards sued upon said notes, etc., etc.

Prayer that an account be taken between complainant and Patrick P. as such administrator, etc., etc., and that the judgments at law upon the three notes be perpetually enjoined, etc., etc.

On the filing of the bill a temporary injunction was granted by the circuit judge, etc.

The answer of Burton was filed at the return term, on the 5th September, 1854.

He admits that Burr had been engaged in the mercantile business in Batesville, for some years prior to the formation of the firm of Shaw & Burton; but was not informed as to the precise objects or motives which he had in view touching the formation of such partnership. Nor did respondent know that

Burr had advanced capital to the amount of $10,000, as alleged, but had heard, and believed it to be true, that whatever capital he did put into the firm was in goods which he then had on hand, or purchased; and he doubtless had an interest in the business of the firm; and aided in purchasing goods, though in this the partners did their part, and in borrowing money for the firm, Philip P. was more efficient than complainant. Respondent did not know what proportion of stock the parties, or Burr, put into the firm, and he submits that this has nothing to do with the subject matter of this suit. Admits that Philip P. was involved in the difficulty referred to in the bill, indicted, tried and acquitted; but how far it occasioned a neglect of the busi-of the firm, respondent did not know, nor did he suppose that such matters had any connexion whatever with the subject matter of this suit.

He admits that the firm of Shaw & Burton was dissolved about the time stated in the bill; and that for a short time afterwards, the business was carried on in the name of Philip P. alone; but upon what terms, or with what capital, respondent did not know.

Admits that about the time stated in the bill, complainant and Philip P. entered into a mercantile partnership as alleged, but as to the terms, or proportion of capital advanced by each, respondent had no positive or particular knowledge, but he denies that complainant advanced all the capital. This firm succeeded to that of Shaw & Burton subject to the short time in which the business progressed in the name of Burton alone; and complainant and Philip P. both told respondent that they had purchased Shaw's interest in the firm of Shaw & Burton at $3,000, which they gave him for it, and that they had made an advantageous purchase, his interest being worth $6,000. This interest and stock so purchased of Shaw, and the interest and stock of Philip P. in the firm of Shaw & Burton formed the basis of the stock on which Burr and Burton commenced their mercantile business, as they informed respondent. And respondent denies the allegations in the bill, that Philip P. did not advance any portion of the capital stock, and that his per-

sonal services were of no real advantage to the firm. And respondent states and believes that Philip P. advanced a fair proportion of the capital stock, and rendered his full share of advantageous personal services to the firm; and complainant admitted the same to respondent, speaking of the tact of Philip P. in the management of their business, and in raising funds, often being able to borrow money, as complainant told respondent, for the use of the firm upon his naked word, when complainant could not obtain it from the same persons on bond with security. Indeed, complainant told respondent that Philip P. was indispensable to him in the business, and that he could not get along without him. Admits that Philip P. became dissipated toward the close of his life, but denies that it produced any such results as alleged in the bill, affecting prejudicially the business of the firms; and to respondent's own knowledge, he rendered much valuable service to the firms and to complainant, in addition to the performance of ordinary business in making long and hazardous trips in the inclement seasons of the year for the purpose of selling horses purchased by the firms, and disposing of them to advantage.

Denies that the causes alleged in the bill are the true ones which induced Philip P. to seek a dissolution of the partnership with complainant; and avers that he became dissatisfied with the conduct of complainant on very different grounds, such as forbade a further association with him in business, etc., etc., and determined to seek a dissolution through means of the law, if it could not be done by agreement.

Denies that complainant made any such representations to Philip P., as alleged in the bill, of reasons why he could not, upon such dissolution, execute his notes to him for $3,000, or that Philip P. made any such reply thereto, as alleged; and that he would hold such notes subject to the contingency of profits on the winding up of the business of the firm, etc.; and this denial is not only made upon respondent's belief, but on the statements made to him by Philip P. himself in his life time.

Has no personal knowledge of the threats of personal violence alleged to have been made by Philip P. towards com-

plainant, but denies the truth thereof to the extent stated, or that if any such threats were made, they were made with the view to coerce complainant to make such notes, or that they had any such influence upon him, or that any of the acts of complainant were done under duress, or on account of fear; and doubts if he was influenced in the matter, by the oft repeated entreaties of personal friends as pretended, etc.

Respondent avers, on the contrary, that complainant and Philip P. differing as to the terms of dissolution, the terms were finally agreed upon, by Wm. Byers acting for both parties, upon a full and deliberate conference as to the terms, and freely assented to by complainant, reduced to writing and signed by the parties as a final and absolute settlement and dissolution of the partnership, subject to no future contingencies whatever, except such as are expressed in the writing; the substance of which is in part stated in the bill, and a copy of the instrument exhibited with the answer, the original being in possession of H. F. Fairchild, and held by him for the benefit of the parties.

The three notes were made and delivered by complainant in pursuance of said article of dissolution; and respondent positively denies on the authority and statement of said Philip P. that at the time said notes were made, or at any other time, there was any agreement whatever, either express or implied, that the notes should be retained by Philip P. until the winding up of the business of said firms; and that he would not attempt to collect them until then; and that if it did not appear upon settlement that such sum was due to him, the notes should be delivered up and canceled; but the whole of such allegations and every part thereof are absolutely untrue, etc., etc.   That Philip P. often told respondent that the acceptance of the notes for $3,000 was merely to obtain a dissolution of the firm, and get entirely free from complainant, and that that sum was much less than was actually and honestly due to him, and which respondent verily believed to be true.   He therefore denies that he was attempting to enforce the payment of said notes in fraud of the rights of complainant as alleged, but was only seeking what was justly due, etc., etc.

He denies that said Philip P. at the time of his death, or respondent as his administrator since, was indebted to any of said firms in any sum whatever.

After disputing the validity of several claims set up by complainant against Philip P., as having accrued after the execution of the notes, respondent states that every credit to which complainant was justly entitled, had been endorsed upon the notes, and allowed and deducted in obtaining the judgments thereon, etc.

He positively denies that he ever knew or believed, or that it was in fact true, that the three notes were executed for the considerations and inducements, and subject to the contingency, etc., alleged in the bill. or that he was ever aware that upon a final settlement of the partnership concerns nothing would be due to Philip P., etc.

He admits that after the death of Philip P. the notes were in his possession, but he positively denies that he, at any time, or in any manner, promised complainant to deliver up said notes to his wife, as alleged in the bill.

He denies flatly, that in July 1851, he was indebted to complainant in the sum of $600, or in any sum; and avers that the note for $400 mentioned in the bill as still due at that time, had been previously paid by respondent to complainant, though not given up, and its payment was admitted by complainant.

He denies that he ever offered to deliver up said three notes to complainant's wife, on consideration that he would agree that the pretended debt alleged to be due from respondent to complainant should be considered as paid, etc.; or that he ever stated that inasmuch as complainant would never have any of the balance of said three notes to pay, they would just consider the amount due from respondent to complainant to be $250, and that respondent would enter that sum as a credit on the one of the three notes last due, and that complainant consented thereto; or that respondent entered such credit on the note. On the contrary he alleges the truth to be that complainant claimed of respondent $250, which he did not owe him, and insisted on having it credited on one of the notes, to which respondent as-

sented for the sake of quiet, and for complainant's accommodation, though he did not owe him one cent, and told him so at the time; and when respondent assented to it, complainant himself endorsed the credit on one of the notes. He denies that after this, complainant considered, or had any grounds to consider the whole matter settled as alleged, etc., or that respondent afterwards put said notes in suit, etc., etc., in violation of any agreement between complainant and Philip P., or between respondent and complainant as alleged. The copy of the written agreement dissolving the partnership between Burr & Burton, exhibited with the answer, and admitted to be correct, is substance, as follows:

" This memorandum of agreement witnesseth that Philip P. Burton has this day sold to Edwin T. Burr, all his right, title and claim in and to the assets of every description of the firms of Shaw & Burton, Burr & Burton, and of the business done in the name of Philip P. Burton, which succeeded Shaw & Burton, upon the following terms and considerations: 1st. The said Burr binds himself to pay, or settle to the satisfaction of Wm. Byers, the debt Shaw & Burton owes Mrs. Emily S. Byers, wife of the said Wm. Byers, which amounts to the sum of $679 37.

2d. Burr is to pay off and discharge all of Philip P. Burton's accounts and individual indebtedness about the town of Batesville, and surrounding country, viz: to Mrs. Newland, R. W. Watson & Co., George Daugherty, Mr. Aiken, Mr. Hunt, Mr. Maxfield, Mr. Bates, Mr. Sloan, Col. C. F. M. Noland and Mr. Harpham, and any other indebtedness of the said Philip P. Burton in this part of the State of Arkansas, although not herein mentioned, except one J. H. Egner.

3d. The said Burr is to pay and save the said Philip P. harmless from all debts and liabilities of the said firms of Shaw & Burton, P. P. Burton, successor of Shaw & Burton, and Burr & Burton, and that may in any wise grow out of the business of the said firms, and is to acquit the said Philip P. from all claims or demands which he the said Burr may have against the said Philip P. of every description whatever.

4th. The said Burr is to pay in the manner following to the

said Philip P., the amount the said Philip P. has advanced to the said firm of Shaw & Burton, to wit: the sum of $2,911 50, for which sum he is to execute his two several notes to P. P. Burton, one for $1,455 75, with ten per cent. interest from date, payable six months after date, the other for the same sum, and same rate of interest, payable twelve months after date.

5th. Burr is to pay to said Philip B. Burton, in addition to the above, the sum of $3,000, for which sum he is to execute to the said Philip P. his three several notes for $1,000 each, payable one, two and three years from date.

6th. Burr is to pay said Philip P. money for his expenses when he leaves this place, say from one to two hundred dollars, which sum, when paid, is to be credited on the note of $1,000 first due above named.

7th. Burr binds himself to pay a debt of two hundred dollars, which the said Philip P. owes to Joseph H. Egner, which said sum the said Philip is to credit on the $1,000 note last due above, named. And it is further understood between the parties, that there is a settlement to be made between said Burr and Dr. Patrick P. Burton, and the said Philip P. hereby agrees with the said Burr, that whenever said settlement is made between the said Burr and Dr. Patrick P. Burton, that whatever amount may fall due from the said Patrick P. Burton to the said Burr upon such settlement, that he, said Philip P. will credit the same on the said note of $1,000 above named last to become due.

8th. And the said Philip P. Burton acquits the said Burr of all demands which he may or might have against him up to this date.

Done at Batesville, this 30th of December, A. D. 1850.

E. T. BURR,<br>P. P. BURTON."

The cause was finally heard, at the March term, 1855, on bill, answer, replication, exhibits, the depositions of Shaw, Fairchild and Byers, and the bill dismissed for want of equity; and Burr appealed from the decree.

It may be seen from the above statement of the allegations of the bill, that the complainant sought an injunction of the

judgments at law upon two grounds: 1st, that the notes upon which the judgments were obtained, were executed by him under circumstances of *duress;* and 2d, that they were made upon an agreement that they were not to be paid until the final settlement of the mercantile firms in which Philip P. Burton was interested, and then only in the event that it appeared that the amount of the notes was due to him out of the profits of the business, etc.; and that complainant had so far settled the affairs of these firms to ascertain that there were no profits, and that nothing was due to Philip P. therefrom.

Passing over the objection of the counsel for the appellee that these grounds of relief were properly cognizable as defences to the suits at law, upon the notes; and that the complainant having failed to interpose them there, was precluded from resorting to a court of equity for relief, we will proceed to determine whether the complainant has made out his case upon the merits.

It may be remarked that every material allegation of the bill tending to support the grounds for relief relied upon by the complainant, is positively denied by the answer of the defendant.

To say the least of the answer, it had the effect to put the material allegations of the bill at issue, and require them to be proven by the complainant. And the defendant's sworn denial of matters charged to be within his personal knowledge, as some of the matters in the bill are, should be overturned by the testimony of two opposing witnesses, or one with strong corroborating circumstances. *Gresley's Eq. Ev.* 227. 1 *Greenl. Ev., sec.* 260. *Watson vs. Palmer,* 5 *Ark. R.* 501. *Cummins ad. vs. Harrell & Scott,* 1 *Eng.* 309.

The deposition of *Fairchild,* read by complainant, proves nothing material to the issues in the cause. He merely states that the original instrument of agreement dissolving the partnership between Burr & Burton, after its execution by the parties was placed in his hands for safe keeping, and that the copy exhibited with the answer of defendant is substantially correct. He knew of no other agreement, or understanding between the parties.

The deposition of *Wm. Byers* was read by defendant. He states, in substance, that in the latter part of December, 1850, Philip P. Burton called upon him to act as a friend and attorney in effecting a sale of his interest in the mercantile firms of Shaw & Burton, P. P. Burton, successor, etc., and Burr & Burton, to complainant Burr; at which time there appeared to be some difficulty or misunderstanding between said Philip P. and Burr about the matter of settlement or sale. Witness consented to act as the friend and attorney of Philip P.; and, as such, he had several conferences with Burr about the matter; and Burr and Philip P had several interviews on the same subject in his presence; but they could not agree about all the details of the sale and purchase of Philip P.'s interest in the firms, etc. They could not agree in what manner Burr should pay witness what was due to his wife, nor as to the time that Burr should have to pay the amounts of capital or money put into the firm of Shaw & Burton by Philip P., nor as to the security that Burr should give for the payment of the $3,000. Philip P. insisted that Burr should pay Mrs. Byers in cash down, and Burr wanted to make some other arrangement, etc. Philip P. insisted that Burr should pay said capital immediately, and Burr insisted upon time. Philip P. insisted that Burr should give security for the three notes of $1,000 each, payable in one, two and three years; but Burr refused to give security. The disagreement was so great that Philip P. declined to have anything further to say to Burr on the subject, but authorized witness to make the sale and settlement for him, investing him with full authority, and agreeing to abide by and confirm whatever he did in the matter. Witness then had several conversations with Burr and with Fairchild, who appeared to be acting as the friend and attorney of Burr in the matter; and finally witness drew up an agreement to be signed by the parties, and submitted it to Fairchild, as the friend and attorney of Burr; and requested him to take it to Burr, and present it to him for him to sign, as the last proposition that would be made by witness in behalf of Philip P. in relation to the matter. Fairchild took the paper thus submitted to the store where Burr & Burton had

been doing business, and in a few minutes returned with it exe-
cuted by Burr.    Witness then took it to Philip P., read and ex-
plained it to him, and he executed it.    Witness then, at the
request of Philip P. and Burr, deposited the instrument with
Fairchild for safe keeping.    A copy thereof is exhibited with
the answer of defendant.    This written agreement, as witness
understood it at the time, was a final settlement of the subject
matter to which it related.    He knew of no other agreement,
or conditions to said agreement, than are expressed in the in-
strument so executed by the parties.    A few days after its exe-
cution, Burr paid witness the amount therein stipulated to be
paid to his wife; and executed the notes named in said agree-
ment under it, and witness understood the matter finally settled.
The three notes upon which the judgments sought to be enjoin-
ed were obtained, are the same three notes mentioned in the
agreement, and were executed by Burr under said agreement.
It was about a week, from the time witness agreed to act as the
friend and attorney of Philip P. in the matter, until the contract
was executed, during which time there was a number of inter-
views between the parties, etc.    In speaking of capital stock
above, witness referred to a certain amount of money which he
understood from Burr & Burton, that Patrick P. Burton, the de-
fendant, had loaned to Philip P. or to Shaw & Burton, or in
some way permitted Philip P. to put into said business, and
which was to be paid or returned to said Patrick P.

During the negotiations between Burr and Philip P., the lat-
ter told witness that he had closed the front door of the store,
and that it never should be opened until said business was set-
tled.    He said he and Burr had had a quarrel about the matter,
and his feelings become so exasperated against Burr that he
finally declined having any interview with him about the mat-
ter, for fear they would have a difficulty, and submitted the
whole matter to witness to settle for him.    Witness knowing
the temperament of Philip P., and fearing that they might have
a difficulty, advised him not to have any further intercourse
with Burr, but to submit the matter to him, which Philip P. did,
and witness finally effected the settlement.

Philip P. for some time before he sold out to Burr, as above stated, had been in the habit of drinking ardent spirits, and witness thought the habit constant, but he had no recollection of ever seeing him intoxicated, or so much under the influence of liquor as to impair his business faculties. Witness thought the habit of drinking increased on him.

The deposition of *Shaw* was read by complainant. He states in substance, that he commenced business with Philip P. Burton, under the style of Shaw and Burton, in March 1847, sold his interest in the firm to Philip P. in Nov., 1849, for $3,000, after his accounts were balanced " *inexclusive* " of his expenses and wages as clerk of Burr, " *which were paid or settled by Burr except a small balance due on the* $3,000, *which he looked to Burr to pay.*" If *Philip P.* ever put any capital in the firm of Shaw & Burton, witness never knew it. Burr was interested as a silent partner, and put in all the goods the firm commenced business on, which invoiced about $10,000. Burr was to contribute his personal services to the firm, which he did as long as witness was a partner. Philip P. got into the difficulty with Aikin a short time after the firm commenced, and devoted but little time to the business, until he was acquitted, which occurred a short time before witness sold out. His difficulty was prejudicial to the business of the firm at home, and impaired its credit abroad. It prevented the collection of claims, etc. After witness sold out, the house went on in the name of Philip P. until March or April, 1850, when the firm of Burr and Burton was formed. Witness was absent from March until November. Soon after his return, Philip P. told him he intended to quit business and leave the country, and if he could not close up one way he would another. He then closed the doors, and told Burr they should not be opened until they settled—that he intended going to Texas—that he was tired of business, and " *disgusted* " with the community. He said he intended to have a settlement with Burr without going into Court.

Burr and Philip P. finally settled, the *exact terms of which witness did not know*—But Burr was to execute three promissory notes to Philip P. after paying some amounts for him about

Batesville, and a debt the house owed Mrs. Byers. Philip P. also said that if he was satisfied the house had made no money he did not want anything from Burr, but that he believed the result of business would be that the house had made money.

After the settlement between Burr and Philip P., the latter told witness confidentially that he never intended to enforce the collection of the notes from Burr—that is, that he never intended that they should interfere with Burr's business—that he never intended to harrass him, for he had the kindest feelings toward Burr—that he never intended to call on Burr for the money until he knew Burr could pay it without its embarrassing him.

The conversations between Burr and Philip P. about their business, during the time the doors of the store were closed, were generally of a quarrelsome character as far as witness knew; and Philip P. frequently requested witness to talk to Burr about their business—saying that he would not talk to Burr about it, that Burr could out talk him, and that he wanted other persons than himself and Burr to settle their business.

During the quarrelsome conversation between Burr and Philip P., the latter said he would have a settlement, and that he had the keys of the store, and the pocket book containing the notes due to Burr and the several concerns, and that he would not give them up until the business was settled between him and Burr. Philip P. first demanded of Burr a release of all liabilities to him, the firm of Shaw & Burton, the house of P. P. Burton, and firm of Burr & Burton, and $5,000, over and above his liabilities to those houses. He finally demanded to have the sum of $3,000 from Burr, but he also told witness that if the house had not made money, he would not demand that amount from Burr; but he was satisfied they had made money, and therefore, he demanded a settlement of Burr on the foregoing terms.

Witness could not say whether the firm of Shaw & Burton had made money or not. There were a great many outstanding debts still due the firm, and Burr had been exerting himself

to close up the business of the firm.  At the time witness sold out to Philip P., the firm owed Burr for stock about $10,000. The whole indebtedness of the firm was about $15,000 or $18,-000, besides its indebtedness to Burr.  The firm was in the habit of borrowing money, but in this Philip P. was not more efficient than either of the other members.  He borrowed for the firm about $2,000 from his father, etc., but used part of it himself, etc.  Philip P. never went off with a drove of horses, or other produce, for the firm of Shaw & Burton.  He went to New Orleans once, mostly for his health, and while there purchased about $2,000 worth of groceries for this firm.  Shortly after the dissolution of this firm, he went off with a drove of horses, and returned with some three, four, or five of them.

The above is the substance of all the testimony introduced upon the hearing.

A contract made by a party, under compulsion, is void; because *consent* is of the essence of a contract, and where there is compulsion, there is no consent, for this must be voluntary. Such a contract is void for another reason.  It is founded in wrong or fraud.  It is not, however, all compulsion which has this effect; it must amount to *duress*.  But this *duress* may be either actual violence, or threat.  1 *Parsons on Cont.* 319.

The bill alleges, in this case, that Philip P. Burton threatened complainant, and that the apprehension of personal violence was one of the inducements to the execution of the notes.

*Duress*, by threats, says Mr. Parsons (*Ib.* 320,) exists not wherever a party has entered into a contract under the influence of a threat, but only where such a threat excites a fear of some grievous wrong, as of death, or great bodily injury, or unlawful imprisonment.

The evidence shows that Philip P. Burton and Burr disagreed about the terms of dissolution and settlement of their partnership affars—that Philip P. quarreled with Burr about the matter—and, finally through the intervention of their friends, Byers and Fairchild, they came to an agreement, and in pursuance of this agreement the notes were executed.  Possibly Burr

was induced, under all the circumstances, to consent to terms which he did not regard as being as favorable to him as they should have been, in order to close up the matter, and get clear of Philip P.; but it is fairly to be inferred from all the testimony, that he finally executed the notes voluntarily, and under no such compulsion as would constitute duress in a legal sense.

The proof also fails to sustain the other ground of relief relied on by Burr. It appears that the terms of dissolution, and sale of the interest of Philip P. to Burr, as finally agreed upon, were reduced to writing, signed by the parties, and the three notes in question executed by Burr in pursuance thereof. There is nothing in the written agreement indicating that the payment of the notes was to be contingent upon the result of the closing up of the partnership affairs. If it were competent for Burr to set up an outside unwritten agreement to defeat the payment of the notes, he failed to establish it by proof. Neither Byers nor Fairchild testifies to any such agreement. Shaw does not pretend to have been present when the terms of settlement were agreed upon, or when the written instrument, or the notes were executed.

Upon the whole record, the final decree dismissing the bill for want of equity, must be affirmed.

During the progress of the cause several exceptions were taken by complainant to decisions of the Court, which are discussed by his counsel here, and which it may be well to notice, though their determination will not affect the final result, as announced above.

On the filing of the answer, the complainant filed exceptions thereto, and moved the Court to expunge therefrom a number of expressions and portions of sentences as impertinent and scandalous, which were particularly designated. The exceptions being, by consent of parties, submitted to the Court, without reference to the Master, the Court decided as follows, the record states:—" The Court is of the opinion that although the matter of the answer excepted to, is not couched in such language as is strictly proper for an answer, and under other cir-

cumstances part of the same might be considered scandalous or impertinent, yet, considering the loose and improper practice, which counsel have generally fallen into in such matters, and that the bill contains fully as much scandalous and impertinent matter as the answer, and which was the foundation of such matter in the answer, said exceptions ought, nor ought either of them to be sustained, and they are therefore, disallowed."

The complainant excepted to the decision.

Neither of the reasons given by the Court for its decision is very satisfactory. If the bill contained scandalous and impertinent matter, the defendant should have excepted thereto, and caused it to be expunged, at the cost of the complainant and his solicitor. *Story's Eq. Pleading sec.* 266. If counsel had generally fallen into the loose and improper practice of inserting scandalous and impertinent matter in their pleadings, it was the duty of the Court to reform a practice so unprofessional; and it might well have commenced the reformation in this case.

In the answer, some of the allegations of the bill are pronounced "*naked and unmitigated falsehoods;*" others "*knowingly and willfully false,*" and in more than one instance, *dishonesty* and *perjury* are in effect imputed to the complainant. There are expressions also in the bill, that were unnecessary and improper.

A direct charge of a fact in the bill, or a positive denial in the answer, is sufficient for all the legal purposes of pleading, without resorting to imputations of *dishonesty, willful falsehood, perjury, etc.* These are the expressions of excited litigants, and should not be permitted to stain the records of a dignified tribunal of justice.

On the coming in of the answer, supported by the affidavit of Byers, stating substantially what he afterwards stated in his deposition, the Court dissolved the injunction with damages, refusing to continue the injunction on the motion of complainant until the next term, etc., and exceptions were taken to these

decisions of the Court, etc. The final result of the cause showing that complainant was not entitled to an injunction, he has no grounds to complain of these decisions, and they need not therefore be reviewed.

The decree of the Court below is affirmed.

Absent, Hon. *C. C.* Scott.