Perkins Oil Company of Delaware *v*. Fitzgerald.

4-5220                                                  121 S. W. 2d 877

Opinion delivered November 7, 1938.

*Elton A. Rieves, Jr., Lamb & Barrett* and *Mann, Mann & McCulloch,* for appellant.

*Shafer & Gathings* and *John D. Martin, Jr.,* for appellee.

BAKER, J. The appellants in this case may be referred to as such, or, for brevity, the Perkins Oil Company of Delaware may be called merely the oil company, and C. H. Caldwell may be designated merely as Caldwell, while the appellee may be referred to as such, or as the plaintiff, or by name, as the occasion may suggest.

The oil company owns and operates a large cotton seed oil mill at West Memphis, in Crittenden county, Arkansas. C. H. Caldwell was an employee of that company and is referred to in most instances as the superintendent in the operation of the plant. Fitzgerald was a young man between twenty-one and twenty-two years of age, employed at that plant as a helper in the installation of some of the machinery, including the particular machine upon which he was hurt, which is called in the complaint and evidence a "cotton seed cleaner." He had worked for several weeks during which the plant

was not in operation, and, at the time the season opened and the plant began operations, he was employed as an oiler. Many electric motors were employed in the plant and these produced the energy to drive the different units of machinery in the manufacture of cotton seed oil and by-products from the cotton seed. In fact, because so many of these different units were located in different parts of the plant it was deemed necessary to have a separate employee responsible for the proper lubrication of all these different or separate units, and it was primarily, at least, the job for which Fitzgerald was employed; that is to say, he was the oiler. According to the record this was not the only duty he owed to his employer, but it was the principal one. Since the appellee is entitled to have the facts, as established by the proof and reasonable inferences therefrom, construed in a light most favorable to him to sustain the verdict and consequent judgment rendered in this case, an effort will be made so to state the facts, omitting, however, as nearly as possible whatever is not deemed absolutely essential to a full discussion and determination of the issues involved. It is the purpose of this form of presentation to avoid as nearly as possible elaborate quotations from evidence as no good purpose may be served by an argument of disputed facts. Such a discussion would tend to prolong the opinion. Perhaps, it may be suggested that the verdict of the jury has settled all these disputed matters and the plaintiff is thereby entitled, in every instance, where there is substantial evidence, to the most favorable conclusions and inferences possible, though we will not attempt to go to that extent in this presentation. The plaintiff has alleged in his complaint, and established by his proof, that Caldwell was his superior, the superintendent in charge from whom he received such instructions as were given him. He was put to work and instructed to fix any machinery he saw broken down or clogged up. This direction or order was given about ten days before the accident, at a time when they were starting the motors, or running them to test them to see if they were in good condition. To use the language as abstracted, the appellee

says that "he told me in the lint room that my duties of oiling the motors would carry me all around the mill, and that in the course of my duties I would have to pass all or practically all of the machinery there, and if I saw anything wrong with the machinery, anything broken down or clogged up, to fix it if I could, and if I didn't think that I could fix it to call the machinist or mill-wright." The foregoing statement is quoted for the reason that the appellee says that this is all the instructions or directions given him in the performance of his duties.

The appellee had grown up as the stepson of an employee of an oil mill, had been about oil mill plants a great deal. He had worked perhaps some in the yard of a mill at Dallas, Texas, before the family moved to West Memphis, where the stepfather of the appellee was employed as a night superintendent. He had worked as a helper in the installation of machinery for several weeks prior to the time of his injury, but had been working as an oiler only a day and a half when he was hurt. The injury complained of grew out of the attempted performance of that part of the instructions to the effect that if he saw anything broken down or clogging up to fix it if he could. At the time of the accident, Fitzgerald testified in passing the said cleaner he saw that it was choking up with seed as the seed passed through the conveyor; that he looked for the attendant who served the particular machine and did not see him and then attempted himself to restore the normal operation of the machine and inserted his hand in the slot or opening where it was choked. This place, according to the description he gave of it, was perhaps ten to eighteen inches below a revolving cylinder on which there were blades or ribs, and by which his hand was caught as he was attempting to clear the machine of the congested or choked condition. He says no instructions had been given to him as to the manner of unchoking or clearing the machine, and that he had seen nobody else perform that service. Employees who usually performed that service, it was testified by others, used a stick or shovel, but may safely use the hand if the hand is kept in the conveyor part of the ma-

chine and not inserted in the upper part containing the
revolving cylinder, which was covered or hidden by the
outer casing and front part of the machine. That outer
casing, or front part of the machine, may serve as a
guard to prevent one from sticking his hand directly in
a place where it will be caught by the cylinder, but it also
serves to conceal the cylinder which the evidence shows
turns sufficiently fast that twenty of these blades or ribs
would strike a given point per second. Though it seems
unreasonable, yet plaintiff testifies that he did not know
of the revolving cylinder prior to the time of his injury;
that no one had told him of it.

The evidence is not exactly clear as to why or how
the plaintiff came to reach one of his hands above the
place in the conveyor where the machine was choking
and insert it into the machine at the point where the re-
volving cylinder caught it. It may be that the excruciat-
ingly torturing pain, the anguish occasioned by the acci-
dent were such that plaintiff never clearly remembered
the exact process used and movements of his hand in un-
choking this machine that caused him to come into con-
tact with the dangerous part of it. No logic or analysis
can supply any missing fact in that respect, but we are
bound by the statements that the plaintiff had no in-
struction in regard to the proper manner to perform this
service required of him and bound also to accept his
statement that he was acting in response to a direct com-
mand given him by one in authority, and that while per-
forming this service in close proximity to dangers he did
not know, had not observed and, therefore, did not an-
ticipate the accident happening in which one of his hands
was caught, and drawn into the flailing machinery. In
attempting to extricate himself from the machine by hold-
ing himself back, his other hand slipped and was in like
manner caught so that both hands and arms were drawn
into the machinery, and both so badly mangled that one
was amputated above the elbow and the other just below.

This accident occurred on the 23rd day of August,
1934. Thereafter, on the 15th day of January, 1935, the
plaintiff signed a release in consideration of the sum of

$5,000 paid him at that time. The particular details in regard to this release will be set forth in a discussion of the error assigned in regard to that matter.

The voluminous pleadings may be narrowed or shortened by merely stating that the only negligence established and finally relied upon arises out of the failure of the superintendent, Caldwell, to give proper instructions for the performance of the duties required of Fitzgerald, or a failure to warn him of the concealed or hidden dangers in the machine, which he was required to service and which injured him while attempting to perform and discharge a duty required of him by the superintendent having control over him. There was no defect in the machine alleged or proven. It is argued, and we think correctly, according to the undisputed proof in this record, that in the conveyor of the seed cleaning machine, where it is said to have choked, there was no hidden or concealed danger, if there was any at all, and it was also urged that Fitzgerald was more than twenty-one years of age, a graduate of the Dallas High School, more than ordinarily apt, and above the average in point of intelligence, and that he must be presumed, as a matter of law, to have assumed the risk of the employment, and in the discharge of the duties which he was attempting to perform.

In response to this argument it is also shown and, we think beyond question, that one standing in front of the machine at the place where he could insert his hand into the conveyor to unchoke or relieve the congested condition of the seed, as the plaintiff was doing, could not see or observe the cylinder and it is not unbelieveable that, although he helped install this machinery, he had not observed this cylinder, or if he had he may not have known its particular function and may not have understood that there was the probability or even a possibility of inserting his hand into a place so destructively dangerous as were the ribs upon this cylinder. Pictures of this machine appear in the record. It is described by several witnesses as well as by the plaintiff himself who seems able to give a most minute, as

well as accurate description of it.. But we cannot say, as a matter of law, that because plaintiff, at the time of the trial, was able to give this minute description of the machine and its functions he could have done so prior to the time of the accident. Doubtless he learned many facts from the horrible in-drawing and flailing of this cylinder as it destroyed both his hands and arms, but he may have learned others since that accident which enabled him to become a witness apparently more observant than laborers ordinarily might be presumed to be who perform such services as he was at that time. It may also be argued that since he had worked at this mill after it had begun operations only a day and a half prior to the injury, had he been apprised or warned of the hidden or concealed danger in this revolving cylinder, he would not have believed that he could have relieved the abnormal condition, but would have waited and called for the usual attendant to perform such service.

So it must appear, we think, that it was the duty of the appellant company, and the superintendent having charge of this servant, and who knew according to his own testimony that he was inexperienced in the performance of such a duty, to give proper directions or instructions as to the best or approved method of servicing the machine as it was done by other employees who had experience and training; that if required to perform the service there followed the legal duty not only to instruct as to the proper method of performing it, but also to warn of the hidden or concealed danger. This is more apparent when it is considered that this revolving cylinder was above the slot or opening in the front of the machine into which the appellee inserted his hand, and that this slot or opening is perhaps a foot or eighteen inches below eye level, and where it may not be observed except by one attempting to make a minute or careful inspection. We think it may well be conceded that it is the duty of the master to give proper instructions and warning to young and inexperienced servants regarding duties required of them and to explain dangers necessarily incident to such performance of duties, and we do not under-

stand in this case that appellants insist that merely because the appellee was more than twenty-one years of age the master did not owe this duty on that account. While it may be true that in most instances wherein an adult applies for and obtains a position he may be presumed to understand the conditions that prevail and will be deemed to have assumed the ordinary risks of his employment, this is not a hard and fast rule that frees a master from the duty to instruct and warn one whom he orders to perform and render services, the master knowing at the time that he gave such orders and instructions that the employee is inexperienced and does not appreciate the attendant dangers. In such a case there can be no presumption that supplies experience or furnishes a warning of danger. This statement is made, having in mind the testimony of Mr. Caldwell who was one of the defendants, and who stated unequivocally that Fitzgerald was too inexperienced to have attempted to perform such duties without proper instructions, experience, or warning. We are not saying that, because of the youth or the inexperience of the servant, he must in every instance be warned, but in this case there were all the elements of youth and inexperience, as the young man had barely reached his majority, and there was the admitted fact of inexperience, and the two combined certainly enjoined upon the master the duty and obligation to instruct and give warning. It was so held in *Southern Lumber Co.* v. *Green,* 186 Ark. 209, 53 S. W. 2d 229, and, also, in the cases of *Ward Furniture M'f'g Co.* v. *Mounce,* 182 Ark. 380, 31 S. W. 2d 531; *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Inman,* 81 Ark. 591, 91 S. W. 832; *Des Arc Oil Mill, Inc.,* v. *McLeod,* 137 Ark. 615, 206 S. W. 655.

Perhaps a dozen other cases might be cited, but we have selected these especially because relied upon by the appellants, and the doctrines announced therein are not inconsistent with, nor impaired in the least by such a decision or opinion as that announced in *Williams Cooperage Co.* v. *Kittrell,* 107 Ark. 341, 155 S. W. 119, for the rule there announced is that as a matter of law one who

shall have arrived at his majority should be deemed as mature and be treated as the ordinary or average intelligent servant rather than the young and inexperienced servant. But we think it must be appreciated and fully understood that there is quite a difference in that class of cases where the master knows both of the youth and inexperience and consequent unfitness of the servant to perform the duties required of him, and not one in which by reason of the maturity of age, and by reason of intelligence, he may be presumed to have assumed the ordinary risks of employment sought by him. Where the master has actual knowledge, no presumption may obtain. Where it is known that both youth and inexperience make the servant unfit to perform a particular duty, no presumption can arise by reason of maturity or by reason of average intelligence. We are impairing in no sense doctrines announced in such cases as *Railway Co.* v. *Torry*, 58 Ark. 217, 24 S. W. 244, wherein it is announced that the master ordinarily owes to a servant of mature years and average intelligence no duty to warn and instruct. The very distinction we are attempting to make was made by this court in the case of *Louisiana & Arkansas Railway Co.* v. *Miles,* 82 Ark. 534, 103 S. W. 158, 11 L. R. A., N. S. 720. Without quoting from that opinion, but deducing therefrom the reason for the rule announced, its application may well apply to the instant case. In part it states that in case of the immature age and inexperience, it is the duty of the master to instruct as to patent, as well as to latent, defects, if, by reason of youth and inexperience, the servant does not know or appreciate the danger incident to his employment, and if the master knows or ought to know or take notice of his youth and inexperience.

We have attempted to make clear, and we think we have presented in a way that it may not be mistaken, that, in this case the master did know of the immature years, of the inexperience of the plaintiff, such inexperience being the result of his youthfulness though he had attained his majority. We can see no difference, and we do not think the law makes any distinction, in a case where

in the master must take notice on account of youth and inexperience, and in a case where there is actual knowledge of such conditions. The law may not be deemed so unreasonable, so unnecessarily contradictory of ordinary humanitarian requirements.

Appellants rely upon another case, the opinion in which was prepared by the writer. *Ward Ice Co.* v. *Bowers,* 190 Ark. 587, 80 S. W. 2d 641. There is quite a distinction in the principle involved in the Bowers case and in the instant case. It is a distinction conditions make, one that we are insisting upon here, that is, that mere youth in itself would furnish no right of recovery where every danger was patent, was known and observed by the servant. In the scoring machine described in that case, Bowers could see the saws into which he stuck his foot, testified he knew it would injure him if he touched it. Yet, notwithstanding that fact and condition, he carelessly kicked his foot into it and was injured. Quite a different condition would have been present had the saws been hidden or concealed, or if he had not known the location of saws concealed in the frame. So, in this case, the cited authority appears neither applicable nor controlling, because the dangerous cylinder with the blades or ribs which did the injury were hidden. In addition, the appellee testified that at the time of the injury he did not know of its location or its danger. Numerous other authorities are cited and relied upon by the appellants, but we think it unnecessary to take these up separately for any kind of analysis as our foregoing statements and conclusions must necessarily be supported by the weight of authority invoked to determine the controversy presented on this question of liability, which is settled by the great weight of authority against the contention of the appellants.

The next question seriously argued arises out of the release executed by the appellee on January 15, 1935. It is most seriously presented and contended that although he was hurt on August 23rd, he was not rushed into any kind of settlement, but that he received and accepted the $5,000 paid to him after full and free deliberation

24

and should be held to be bound thereby. The appellee, however, contends that this settlement was not entered into freely and voluntarily, but that it was made under a form of compulsion, so great that he found it to be irresistible under the circumstances that prevailed at the time. It is contended by him that shortly after his injury he was advised by both Mr. Jasspon and by Mr. Caldwell that he would be helped or aided by the employees of the company to recover a sum commensurate with the disabilities he had suffered, it being suggested by one of them, it is immaterial which, that he should have $100,000, and by the other that he should have a sum sufficient to enable him to live throughout the remainder of his life without having to work at anything. He had consulted, after the injuries received, and prior to the date of settlement, lawyers eminent in the profession, of admittedly great ability; and, only a day or two before the release was executed, he had received a letter from one firm, with whom he had conferred, asking him to return for another consultation. He gave us his reason for not going back, which he says was also the reason for the execution by him of the release, threats which he alleged were made by Mr. Jasspon, who was one of the owners of the cotton seed oil mill properties, and who was in the active charge thereof, to the effect that if he did not accept the $5,000, which was the extent of the contractual liability of the insurance company carrying the risk for the appellant, immediately upon the filing of the suit or employment of attorneys, the stepfather of the appellee would be discharged, and that every influence possessed by Mr. Jasspon would be exerted to prevent his re-employment by any other corporation in a like business. He says that Mr. Jasspon told him he knew the condition of the family; that his stepfather and his mother and his brother, who had an invalid wife, as well as himself, were all wholly dependent upon the labor and earning of his stepfather; that Mr. Jasspon also advised him that his company had employed eminent counsel and that they would be able to defeat a recovery, or, if not, to delay it for a period of

perhaps ten years. He says these threats, or similar ones were made on two or three different occasions, at one time when he was alone with Mr. Jasspon, or perhaps accompanied by his mother, and at another time when he had returned to the office with a young lady friend, who had insisted, after he had told her of these threats, that she be permitted to go with him for another interview with Mr. Jasspon. His statements were corroborated in part, at least, by the young lady mentioned by him, and, also, by some other facts tending to show that at about that time Mr. Jasspon and other officers, or agents of the appellant company discovered that the liability of the insurance company was limited to $5,000. This evidence in regard to this settlement and release was disputed by Mr. Jasspon, and, of course, the facts became an issue to be determined by the jury, if the contentions stated by the appellee were in law sufficient to vitiate or avoid the settlement and release. We cannot think there is any necessity for arguing the foregoing proposition. However forceful Mr. Jasspon may have been in the denial of the charge made by young Fitzgerald, the question of whether he made the statements, or threats was still a proposition properly to be submitted to the jury and to be determined by them, if Fitzgerald's contentions were worthy of consideration. Since the jury has settled this matter adversely to the contention of the appellants, we must determine now, as a matter of law, if these statements so proven and established were in law sufficient to vitiate or void the release.

We think it unnecessary to copy or set forth the release executed by James Fitzgerald, but deem it sufficient to say that it was executed by him, and that it is sufficient in form to operate as a complete release and discharge of the defendants unless it was entered into under some form of compulsion or duress sufficient in law to destroy its effect.

We think it may not be of any benefit to set forth and discuss matters so forcefully argued by the appellant company to the effect that young Fitzgerald had prior to the date of this settlement made a complete and de-

tailed statement of the facts in regard to his injury; that he had conferred with several attorneys, and that at least some of them had advised him that it would be to his best interest to make or accept the settlement offered. He agrees that, at least, one attorney did so advise him, but says this was after he had actually made the settlement. But all this, however forceful it may seem as a matter of argument, was properly submitted and determined as a jury question.

It is now argued that there are three causes or reasons whereby the release or contract may be set aside (a) those that were induced by fraud or misrepresentation on the part of the releasee, (b) where there is a mutual mistake of fact, and (c) where the act of plaintiff in signing the release was induced or resulted from duress or coercion practiced on the plaintiff by the defendant.

There can be no insistence in this case that there was fraud or misrepresentation nor was there any mutual mistake. The remaining question to be determined is whether the facts stated show that the release was the result of duress or coercion practiced by the appellant company. We are cited to the case of *Burr* v. *Burton,* 18 Ark. 214. In that case the court said that duress by threat, such as to render the contract void, must be sufficient to excite a fear of some grievous wrong as of death or great bodily harm or unlawful imprisonment. Without attempting to distinguish this case from others of like character, but without neglecting the effect of his case, we next examine *Bosley* v. *Shanner,* 26 Ark. 280. It was there held that in order to render a contract void, because of threats or menaces, it was necessary that the threats and circumstances be of a character to excite the reasonable apprehension of a person of ordinary courage, and the promise, contract or statement should be made under the influence of such threats or menace. Also that doing a thing one had a legal right to do would not be such cause. We think it apparent from this announcement, made only a short time after the declaration of law in the case of *Burr* v. *Burton,* *supra,* shows a progressive tendency toward a more lib-

eral consideration of causes that would tend to avoid a contract.

We are, also, cited to the case of *Ellis* v. *First National Bank of Fordyce*, 163 Ark. 471, 260 S. W. 714. In that case the defendants set up in their answer that they were forced and coerced by the plaintiff to sell certain lumber at a price less than the actual value and that the draft was the result of such coercion. The demurrer to the answer was sustained. On appeal this court said: "It is not duress to threaten that which a party has a legal right to do, and the fact that a party threatens to bring suit to collect a claim constitutes neither duress nor fraud and a compromise of such a claim is binding in law."

The case of *Gus Blass Co.* v. *Tharp*, 194 Ark. 255, 106 S. W. 2d 608, is cited as controlling in this case. This was a release which was sought to be set aside on the ground of fraud and mistake. The facts in the case were that a short time after the accident the injured party was paid $40 to sign full release. About four months later he claimed that the release was void because it was signed before he had an opportunity to discover the extent of his injury. He was then paid an additional compensation of $90 and executed a second release. He sought to set that aside because he said at the time it was signed he was in ignorance of the extent of his injuries. The defendant, however, made no misrepresentation of any kind. It was held that the release was a complete defense.

We think it unnecessary to set forth the language of this court in reaching the conclusion set out under the foregoing stated facts. The discussion, however, is interesting and the authorities cited are numerous, as is also in the case of *Kansas City Southern Ry. Co.* v. *Armstrong*, 115 Ark. 123, 171 S. W. 123.

In no one of these last-cited cases does there appear to be any mistake or any fraud or duress practiced to secure the execution of the release. As set forth in one of the discussions, it is stated: "Nor is it a case where there was fraudulent representations as to the contents of the written instrument, or any trick or subterfuge

whereby the papers were substituted so as to induce the contracting party to execute it, as in *Hot Springs Railroad Co.* v. *McMillan,* 76 Ark. 88, 88 S. W. 846.'' Otherwise stated the defendant company did not in any manner by fraud or by over-reaching, or by duress, in any form, induce the execution of the contract or release relied upon. Although the contract was held to be an improvident one the court was impelled to support it.

To the same effect were numerous cases cited and discussed, all of which we have examined and determined that they arrive at, or reach the same uniform conclusions as those wherein such contracts were fairly and openly entered into without fraud, mistake, deception or any form of duress. They were ordinarily held to be good. But in those cases in which these contracts were induced by some form of fraud, by over-reaching, by deceptive promises, relied upon, or by some form of duress, sufficient under all the prevailing facts and circumstances to impair the deliberate judgment to the extent that it might be determined that although the contract had been signed, it had not been agreed to, such contracts have uniformly been held voidable at the instance of the injured party.

One of the most recent of the cases of the type mentioned is *Harper* v. *Bankers Reserve Life Company,* 185 Ark. 1082, 51 S. W. 2d 526, and a still more recent one is *The National Life & Accident Ins. Co.* v. *Blanton,* 192 Ark. 1165, 97 S. W. 2d 77. In the Harper Case, first above mentioned, we find the court's statement of facts to be as follows: ''On that date, accompanied by a notary public of Corning, Arkansas, said agent called upon appellant, told her the policy was void because her husband had misrepresented his physical condition in the application, that his statements in this regard were warranties, were false, and that, because of such false warranties, the policy was void. He offered to return the premium paid, about $29, which she refused, and he finally offered her $100, stating that if she refused she would get nothing.''

This court in regard thereto said: ''In determining the question here, we view the evidence in the light most favorable to the complaining party. . . . Appellant

is a woman of moderate education, not unlettered or ignorant, but inexperienced in business matters, . . . She was not well at the time. Dow told her the company didn't intend to pay the policy, and that he had brought the premiums, about $29, and would pay that back, and wanted to take up the policy. . . . He told her Mr. Harper 'lied' in his application, and that he had cancer of the rectum at that time, and the policy was null and void. She told him if she couldn't collect the policy she would lose her home, and that he talked to her so she broke down and cried; told her again the return of the premium was all he would pay.''

She finally accepted an offer of $100. Finally the court, in deciding the case, said: ''But the question here is, was the settlement conclusive of appellant's rights as a matter of law under the evidence, or was it a question for the jury? We think the question one for the jury as to whether the release was procured by fraud or coercion.'' A much more liberal theory than that announced in the early case of *Burr* v. *Burton,* 18 Ark. 214. So, also, is the case of *National Life & Accident Ins. Co.* v. *Blanton, supra.* In that case there is a discussion of the elements constituting duress under the facts there stated and under the decisions of this court. The Blanton Case, perhaps, did not go or reach the same degree of liberality as did the last-cited case, *Harper* v. *Bankers Reserve Life Co.,* but, at least, under that case, as well as under the Harper Case, a favorable statement to support the position of Fitzgerald is that according to his evidence he believed Mr. Jasspon would not only discharge his stepfather and render the family, including his mother, and his brother who had an invalid wife, comparatively helpless; that by reason of his influential position he could prevent the re-employment of the stepfather after such discharge; that all of them were wholly dependent upon the earnings of the stepfather, and that in addition he held his stepfather in the very highest regard or had for him the same love that children have for their parents; that he had in fact never known any other father; that he had been sent for by Mr. Jasspon, who had delivered this message to him as a kind of ultimatum, though he

did not use that expression, presenting to him, under that threat, the most serious consequences that he thought were possible to happen in his afflicted condition, where he was a helpless cripple, a burden on the parents, as well as was the brother with the invalid wife. He says that he was told when he employed counsel to maintain his suit, if he failed to accept the $5,000, the discharge of his stepfather would immediately follow and that the litigation would be extended for a period of ten years. It certainly takes no great powers of reasoning to reach the conclusion that young Fitzgerald says he reached; that is, that he was confronted with poverty and distress, not only for himself, but for all others whom he loved and who were responsible for his own existence and maintenance. Under these circumstances and facts, which are as stated, concluded by the verdict of the jury, it would be impossible to declare, as a matter of law, that this release was signed free from the influence of the coercion or duress imposed by the conduct established. It is argued that this testimony is unbelievable. The answer is that it was submitted to the jury and that the jury believed it and that is finality. Supported as this verdict is by the evidence, not only of Fitzgerald, but by others, the barrier is formed which we would not dare to pass.

Appellants present for our consideration instruction No. 1 given at plaintiff's request, and which it is insisted is inherently erroneous. That instruction is as follows:

"You are instructed that releases and contracts, to be valid, must be voluntarily made, and, where executed under such circumstances as would enslave the will, the release or contract is void; because consent is of the essence of the contract or release, and where there is compulsion, there is not consent, for this must be voluntarily. Such a release is void for another reason. It is founded in wrong or fraud. It is not, however, all compulsion which has this effect; it must amount to duress. But this duress must be actual violence, or threat. Duress, by threats, exists not wherever a party has made a release under the influence of a threat, but only where such a threat excites a fear of some grievous wrong."

We cannot agree with appellant in this respect. We think, however, that this instruction is most inexpertly worded or inaptly expressed, but that condition might have been corrected by a specific objection calling attention thereto. Appellants take particular exception to the words: "such a release is void for another reason. It is founded in wrong or fraud."

The release discussed by the trial judge in this instruction to the jury and which he said is void is not the release under consideration in this case, but it was the hypothetical release described by him in the foregoing part of the instruction, and we think that it is the only interpretation susceptible under the circumstances. We cannot think that the jury understood otherwise. There was no specific objection calling attention to these matters and the apparently incorrectly stated proposition is not one in fact. Under a specific objection, however, the method of expression might have been improved, but we do not think that the instruction was inherently wrong.

Finally, the appellants argue that Fitzgerald should not have been permitted to sue or maintain his suit except upon condition that he restore the $5,000 paid him for the release. The weight of modern authority decides this question adversely to appellants' contention. *National Life & Accident Ins. Co.* v. *Blanton, supra; Chicago, Rock Island & Pacific Ry. Co.* v. *Matthews,* 185 Ark. 724, 49 S. W. 2d 392; *Harper* v. *Bankers Reserve Life Co., supra.* There are many others.

We have attempted to discuss the material matters presented upon this appeal. In doing so this discussion has perhaps been too long. Other matters of less importance have been duly considered, although not presented here in this discussion. Upon the whole case there appears to be no error in any one of the several matters urged by the appellants. It may be said that it is also argued that the verdict of $45,000 is excessive. We do not think so. This young man is injured to the extent that both arms have been removed by amputation, one just below and the other just above the elbow. It appears that although he has been given artificial arms, he is still unable to dress himself, or to wait upon himself, he

32

must always be a burden upon someone else to render himself the services required, on account of his affliction, and that, to maintain himself in the future, there is a practical necessity that he must maintain someone else to do for himself, the things impossible now to be performed by him. This condition is brought about solely on account of the injuries suffered by him. He has an expectancy of 41 years plus. During that time, with earning capacity unimpaired with only reasonable advancement, he might have earned approximately that sum. The recovery, of course, should compensate for pain and suffering, for humiliation and the anguish on account of the loss of limbs, the impaired earning capacity, as well as the increased expense of living occasioned by the injury. These things are too patent to require argument or citation of authority in support of the conclusion we have reached, that the verdict and judgment are not excessive.

The judgment is affirmed.