FORT SMITH GAS COMPANY *v.* LEWIS.

4-6340                                              150 S. W. 2d 622

Opinion delivered May 5, 1941.

428

*Miles & Young,* for appellant.

*Ralph W. Robinson,* for appellee.

HUMPHREYS, J. This suit was brought by appellee against appellant in the circuit court of Crawford county to recover $3,000 in damages for injuries received by him in falling over a board three or four feet high sticking in a hole it had dug in the traveled portion of a street in Alma, Arkansas, to find a leak in its gas line laid underground, without placing any light or signals on or near said board to warn the traveling public of the dangerous condition carelessly and negligently created by it.

Appellant filed an answer denying all the material allegations in the complaint and pleading as an affirmative defense contributory negligence on the part of appellee. The cause was submitted to a jury upon the pleadings, instructions of the court and the testimony introduced by the parties, resulting in a verdict and consequent judgment for $500 against appellant, from which is this appeal.

The undisputed evidence reflects that appellant was and is a corporation owning, transporting, selling and distributing natural gas in Crawford county, Arkansas, including the town of Alma, and in the course of the operation of one of its pipe lines in Alma at the intersection of highways 64 and 71 and in front of the Homer Wilmon Cafe it dug two holes in the concrete apron in front of said cafe extending out to the concrete on the street hunting for a leak in the pipe line, and after filling the holes with dirt several inches above the concrete carelessly and negligently stuck boards upright in the filled holes extending three or four feet above the dirt and leaving them several nights without any lights or signals to warn the traveling public of the dangerous condition created by it; that on the night of August 11, 1940, about ten o'clock, appellee who was in the cafe started home

and while walking at an ordinary gait and after taking six or seven steps, he came in contact with the board sticking up three or four feet in one of the holes and fell to the pavement and injured his back.

Appellee testified at length as to where he lived, his age, a trip he had made to Oklahoma where he worked for about a month before he was injured, and his return trip to his home by way of Alma, the time he reached Alma and the Wilmon Cafe on the night of August 11, 1940. It is unnecessary to set out this part of his testimony in detail. His father's sister had married Homer Wilmon, who operated the cafe, so he ate supper and sat around in the cafe until ten o'clock, p. m., before starting out to his father's home some seven or eight miles from Alma, with whom he made his home. Appellee was twenty-two years of age and still resided with his parents.

Appellee testified that about ten o'clock p. m. Wilmon closed his cafe and they walked out together and Wilmon turned out the lights; that after the lights were turned out it was partially dark in front of the cafe, although the moon was shining; that after he separated from Wilmon he took six or seven steps and walked into a board sticking up in one of the holes and fell to the ground; that his feet hit the pavement as he fell and his back hit a rock or the dirt or whatever was piled up there; that this board was about three feet high; that after he fell Wilmon dragged him into the cafe and laid him down where he remained until Dr. Galloway came and gave him a shot; that the fall caused a quick jerk in his back which felt as if something was torn loose around his belt line; that he could not sit up so he laid there until an ambulance came and took him to a hospital in Fort Smith; that he was suffering great pain and was given another shot and some medicine at the hospital that night, Monday night, but the treatment did not ease him; that Tuesday morning Dr. Krock examined him and pressed around on his stomach and that evening came in and asked whether his bowels had moved and whether his kidneys had acted; that when he was informed that both had he made an X-ray which he said showed negative; that no bones were broken, but that he might have strained his back; that

he told him to go home, but to come back every day or so; that he went home Wednesday and remained in bed for two weeks and was not able to get up; that he suffered with his back and head and took aspirin tablets to get relief; that he went back to the hospital and Dr. Krock examined him again and told him to come back again; that he went back again and again Dr. Krock examined him, but did nothing for him; that he got able later on to walk around and tried to pick cotton, but had to quit on account of his back; that a little later he tried to cut wood for Jim Huls, but after sawing two cuts his back gave way and Mr. Huls had to assist him in getting back home; that since the fall he had been nervous and unable to work on account of the weakness in his back; that prior to his injury he was strong and able to do any kind of manual labor; that he would have gotten employment from Jim Huls or his uncle over in the bottom at $1.50 a day, but was unable to work; that he still suffers pain and is very nervous.

Homer Wilmon testified to the holes being dug by appellant and the boards being placed therein in an upright position and being left in that condition for several days without lights or other signals to warn the traveling public of the dangerous condition in which they were left, also to dragging appellee into the cafe and calling for the doctor and Mr. Crews, who had charge of appellant's gas system; that both came and the doctor gave appellee who was suffering great pain a shot and that Mr. Crews called an ambulance and sent appellee to a hospital at Fort Smith; that Mr. Crews pulled up the boards and threw them in the alley and the next day had the dirt leveled down to the concrete and a few days thereafter covered the holes with concrete.

Appellee's father, mother, sister, Homer Wilmon, Jim Crews, Charles McClure and T. H. Langston all testified that appellee suffered greatly. Most of them testified that he remained in bed several weeks and at the time of the trial was still unable to work and in a very nervous condition.

Dr. Krock, who examined him several times, testified that appellee received no objective evidence of in-

juries to his back; that the X-ray showed negative and that while the X-ray would not reflect a strain or injury to the ligaments in his back the physical examination he gave him did not indicate any injury to the ligaments in appellee's back; that such a fall as appellee claimed he had would not necessarily result in a nervous condition, but might by a narrow margin result in some injury to the nerves; that he did not give him any sedatives, massages or apply heat because he could not find anything to treat him for.

Appellant first contends for a reversal of the judgment because appellee's own testimony as to how the injury occurred is not supported by the physical condition upon which the same is based. It is argued that appellee's testimony as to how he fell is at variance with the accepted laws of physics; that if walking forward into a board his momentum would cause him to fall forward instead of backward. This would depend on whether he was walking slowly or very rapidly. He testified that he had only taken eight steps at the outside and was walking at an ordinary gait when he came in contact with the board. It is not likely that the momentum acquired in such a short distance in walking at an ordinary gait would necessarily cause him to fall forward. Generally when one becomes entangled with an obstruction to such an extent that he loses his equilibrium there is no telling just which way he will fall. We are not willing to say that the testimony describing the fall was in conflict with physics or the law of gravity. It became a question under all facts and circumstances for determination by the jury.

Next, appellant contends that the judgment should be reversed because appellee sustained no injury whatever. It is true that Dr. Fred Krock testified that he found no outward evidence of any injury and from the X-ray he had taken and from his physical examination of him he discovered no injury to the ligaments in his back. We think there is too much substantial testimony in the record showing that the appellee suffered great pain after his fall and that he was forced to take to his bed and remain there for several weeks and that he was

unable to work, to conclude that appellee was not injured by the fall. We think there is ample evidence to show that he was injured and sufficient to sustain the verdict and judgment. Appellant's contention is that he was not injured in any manner whatever. No contention is made that the verdict is excessive except on the ground that he sustained no injury of any kind.

The doctor admitted that he was in a nervous condition, but in his opinion such a fall as appellee sustained would not necessarily result in injury to his nerves.

Lastly, appellant contends that the judgment should be reversed because the court erred in giving instruction No. 7, which is as follows: "If you find for the plaintiff you will fix his damages at such a sum as you may find from the evidence will fairly compensate him for the injuries received by him, if any, and in determining this you may take into consideration the mental and physical pain and anguish, if any, suffered by the plaintiff on account of said injuries, if any; his loss of time from his work, if any."

The correctness of this instruction is challenged because it is said that the evidence does not show that appellee was working or sustained any loss of time from work.

Appellee testified as follows relative to his opportunity to work if he had not been injured: "Q. Did you have any employment that you could have been working at? A. Yes, sir, I could have over there with Jim Huls or down in the bottoms with my uncle. Q. What would that work have paid you? A. A dollar and a half a day. Q. What would you have been doing? A. Farming down there and up here cutting wood. Q. Did you go to Jim Huls and try to work one day? A. Yes, sir."

He further testified that he had received a letter from Jim Huls while in Oklahoma offering him work if he would come back which would have lasted perhaps all winter.

Jim Huls testified as follows: "Q. After he was able to be up and about, did you have any experience with

him? A. Yes, sir. Q. Tell the jury about that? A. I wanted him to help me cut some wood, that was about five weeks after he was hurt and he said that he would help me and he went down and helped me saw off two blocks and just had to take out. Q. Did he try to help you? A. He tried to, but couldn't make it. Q. What happened to him? A. I had to help him up to the house, his back gave way on him, and I had to go up the hill and help him up to the house. Q. Did you have to physically help him? A. I had to put his arms around my shoulders and help him up that way.''

In view of this testimony we do not think that instruction No. 7 was abstract on account of submitting to the jury as an element of damages any loss of time that appellee might have sustained on account of the injury.

No error appearing, the judgment is affirmed.