Charles L. STEVENS, Respondent,

v.

MISSOURI PACIFIC RAILROAD
COMPANY, Appellant.

No. 48741.

Supreme Court of Missouri,
Division No. 1.

March 12, 1962.

**124**

George W. Holmes, Mark M. Hennelly, Allen D. Churchill, St. Louis, for appellant.

Jo B. Gardner, Monett, for appellee.

HOUSER, Commissioner.

This is a suit against Missouri Pacific Railroad Company for damages for personal injuries sustained by Charles L. Stevens when an explosion occurred in a fire on the property of the railroad. From a judgment for $27,000 entered upon a jury verdict in that sum the railroad has appealed.

The petition alleged that while plaintiff was on defendant's premises in Sylamore, Arkansas, with the actual knowledge of defendant, and while defendant's work crew was burning various materials and objects in a fire within a few feet of where plaintiff was standing (the fire, materials and place where it was burning being under defendant's exclusive control) defendant, by the carelessness and negligence of its employees, and without warning to plaintiff, "caused, permitted and allowed a sudden and violent explosion in said fire which was of such a nature and character that it would not have happened except for the presence of some unusual, dangerous and explosive substance; that the nature and character of such items are peculiarly within the knowledge of defendant and are not known to plaintiff"; and that as a direct result of defendant's negligence foreign objects flew into plaintiff's eyes and body to his great injury.

The answer, after denying generally, affirmatively pleaded contributory negligence and that plaintiff knowingly trespassed and came onto defendant's property for his own convenience, not for any purpose connected with defendant's business or for the common or mutual interest or benefit of the parties, and without any inducement by defendant.

Appellant's point of chief reliance is that at the time and place of injury plaintiff was a trespasser and that the general rule of nonliability of a landowner for injuries to a trespasser is applicable.

Charles Jeffery, foreman of a scaling gang, lived in a railroad bunk car. One of the duties of his gang was to use dynamite, detonated by fuse caps. Railroad regulations required that dynamite caps be kept

apart, in the tool car, under lock and key. Charles Jeffery died. James Hughes, a member of the gang, and Tuck Brady, interim foreman, accompanied Mr. and Mrs. Henry Jeffery, relatives of deceased, to the bunk car to sort out and take the latter's personal effects. They unlocked, entered and searched the car. In a desk drawer Hughes found a box containing 50 dynamite caps. Hughes took these caps and "locked them up with the others" (presumably in the tool car). Henry Jeffery found a small package of dynamite caps in a little closet in the end of the bunk car. They were in a box. Without counting them he put them back and left them in the closet. He saw some clothing, paper and other items in the closet. When they left they locked the car. Charles Jeffery's successor, Hubert Jeffery, ordered the car brought to Sylamore, Arkansas. After it arrived, locked, he unlocked it to see what kind of living quarters he was going to have. Finding the floor covered with newspapers and time rolls, he picked up the paper and threw it out of the car, got a broom and started sweeping the car. A section gang and an extra gang was on hand to help clean out the litter and trash. James Hughes and three men of the section gang, Gilihan, Beavers and Pitts, entered the car to help Jeffery clean it out. Hughes, called as a witness for plaintiff, testified that before he started cleaning out the car he told Jeffery, Brady and the members of both the section and extra gangs that he had found a box of caps, "and for them to look out for these dynamite caps, that there could be some more." The railroad employees who received this information, in addition to Jeffery, Brady, and the three above-named men who were helping inside the car, were Wadley, John Stevens (father of plaintiff), Pogue and Vines. The latter four were on the ground outside the car. Brady and Hughes had equal responsibility as foremen. Neither of them instructed the men to make a search of the trash and clothing before they handed it out of the car or threw it on the fire "to see if there was anything in it." On the morning

in question Hughes looked for the caps "everywhere imaginable in the car" but found no caps. Brady knew that a fire could set a dynamite cap off without a detonator "in certain instances." He said he would "be afraid to throw it in the fire." One of the railroad employees started a fire on the ground next to the bunk car door. The men in the car gathered up "old personal effects that were of no use," old socks, shoes, dress slippers, a slicker, cardboard cartons, boxes, cans, bottles, a jacket, jumpers, and threw the "stuff" out the door of the bunk car or handed it to the men on the ground, who put the material on the fire. The fire was burning out in the open, alongside the bunk car, three or four feet from the ends of the ties.

Plaintiff testified he went onto the railroad property to ask his father, John Stevens, for permission to use the truck to take plaintiff's wife to the doctor. John Stevens was a member of the gang cleaning out and burning the refuse from the bunk car. Knowing that his father was going to work at the north end of the depot that day, plaintiff went to the depot, where he stayed about three minutes, talking to his brother. Then he walked north on the railroad property to the area where a motor car was being unloaded and watched this process for about 15 minutes. About fifteen people were there, including plaintiff's father. After the employees finished unloading the motor car they went to assist in the cleaning out of the bunk car. Plaintiff went with them. The explosion occurred about 15 minutes after the employees quit unloading the motor car.

Jeffery, inside the car, knew there was a fire outside. He saw the smoke but did not "know what they were doing." While the fire was in progress there "was a big explosion sounded loud." It was an explosion in the fire. "Stuff started flying." All of the men were "knocked back"; some knocked down. The men in the car heard the explosion—the distinctive sound of a dynamite cap exploding—a sound "like a dynamite

cap or something exploded out there." Brady, testifying for the defendant, said there was an explosion which "sounded about the same noise as a stick of dynamite." John Stevens, whose deposition was offered by defendant, testified it sounded like a dynamite cap; that he was familiar with dynamite caps, having handled them all his life since 1926; that it sounded to him like half a box of caps exploded. The explosion jarred the windows of the bunk car, blew out the fire, raised dust in the area, blew the materials in the fire "to pieces" and blew a hole the size of a wash pan in the rock ballast where the fire had been burning. No warning was given that there was going to be an explosion. Several of the railroad employees, as well as plaintiff, were injured by flying fragments. After the explosion the men stood around, bleeding and suffering pain. Arrangements were made to transport all of the injured, including plaintiff, to a hospital in a nearby town. Plaintiff had slivers of metal in his leg. A round, copper fragment the size of a pea was removed from his knee. Plaintiff, familiar with the copper in dynamite caps, testified that the piece taken from his knee was similar in color, thickness, and shape to a dynamite cap. A piece of metal was extracted from plaintiff's eye. A fragment removed from Vines' face was "a piece of a dynamite cap." A small sliver was taken from Pogue's neck. Three pieces hit plaintiff's father in the eye, resulting in the loss of the sight of his right eye.

The railroad tracks run approximately north and south at Sylamore. The main line track lies west of the depot and a "house" track lies east of the depot. A woven wire fence runs north and south along the east line of the railroad property. There is a community well located on the railroad property between the main line track and the house track. The bunk car was spotted on the house track. Sylamore has no water system. For 15 years or more the citizens of Sylamore have been permitted to use this well. The public has not been "kept out of there at any time by the railroad." Although people in Sylamore catch water off their houses and run it into cisterns, others do not have cisterns. The well is used without regard to the time of the year (both in wet seasons and during drouths). Plaintiff testified he would get water from the well on the railroad property whenever he wanted it. The public gains access to the well either by crossing a cattle guard in the line of the fence southeast of the depot and walking north past the depot to the well, or by entering the railroad property through a gate in the fence north of the depot and walking across a path which leads southwest from the gate to a point on the house track near the second Western Union telegraph pole north of the depot, and then either walking south down the house track to a point opposite the well or crossing the house track and walking south on the right of way between the main line and the house track to the well. According to the plat, the cattleguard is 80 feet south and 45 feet east of the depot; the well is 150 feet north of the depot; the bunk car was spotted approximately 260 feet north of the depot; and the gate in the fence is 290 feet north and 45 feet east of the depot. The gate and path have been used for at least 17 years by the public going to get water at the well and by employees going to work. Plaintiff's evidence spotted the door of the bunk car (from which the refuse was thrown and near which the fire was burning) at approximately the point where the path ends, near the telegraph pole, and placed plaintiff at the fire a few feet from the door of the bunk car, immediately adjacent to the path.

Plaintiff testified he was at and around the fire from the time it was set until the explosion occurred some 15 minutes later; that he was talking to the men, with all of whom he was acquainted. Two or three of them were his relatives. Plaintiff was standing two or three feet west of the fire at the time of the explosion. Vines, a section hand, called as a witness by defendant, testified that plaintiff was at the fire continuously for a period estimated by him at

not more than 10 minutes before the explosion. Pogue, a trackman whose deposition was offered by defendant, testified he saw plaintiff "there at the fire." Phipps, a section gangman whose deposition was offered by defendant, testified he saw plaintiff there on the ground before the explosion, talking to his father, and that plaintiff had been there "a right smart bit" before the explosion. Plaintiff's father testified that plaintiff "came up to the fire." Hughes testified he saw plaintiff there after the explosion, and that he went to the hospital in a car with plaintiff. During the trip plaintiff told Hughes his eye was hurting and held his hand over one eye. Jeffery did not remember seeing plaintiff outside the bunk car at the scene of the explosion, but did not affirmatively testify that plaintiff was not there. Brady testified he did not see plaintiff there before the explosion, or if he saw him he did not notice him, but that he did see plaintiff afterwards at the hospital with a piece of gauze over one eye.

In support of its principal contention that the court should have directed a verdict in its favor appellant urges that plaintiff entered the premises for a personal reason not within the scope of the license to get water from the well; that plaintiff was injured not in the area of the well but 200 feet north of the well, far removed from the permissible area covered by the license, and that having strayed to an out of the way place on the railroad property plaintiff exceeded the bounds of his license and became at worst a trespasser, at best a licensee; that the railroad was under no duty "to put its land in a reasonably safe condition for his reception, or to carry on its activities so as not to endanger him" and was not liable "except for wantonness or some form of intentional wrong or active negligence."

■ In his brief on appeal respondent, not denying that he was a trespasser or licensee, charges that the railroad was absolutely liable for plaintiff's injury "regardless of what status he occupied while on defendant's premises," on these grounds:

(1) that the railroad violated certain fire regulations promulgated by the Director of State Police under Chapter 8, Sections 810 and 811, Arkansas Statutes on Fire Prevention; was guilty of committing a nuisance on its premises, and therefore the court should have directed a verdict for plaintiff. This theory, which was no part of the pleadings at the time of submission, was not submitted, and was raised for the first time in respondent's appellate brief, comes too late and may not be relied upon in support of this judgment. (2) that under the Arkansas common law the railroad is absolutely liable and status is immaterial where dangerous substances are involved. Respondent cites Missouri Pac. R. Co. v. Slatton, 193 Ark. 356, 100 S.W.2d 86; Sinclair Refining Co. v. Gray, 191 Ark. 175, 83 S.W.2d 820; Phillips Petroleum Co. v. Berry, 188 Ark. 431, 65 S.W.2d 533 and Holden v. Carmean, 178 Ark. 375, 10 S.W.2d 865. Neither the cited cases, nor any others to be found, support respondent's theory of absolute liability. In Arkansas liability for injuries or damages sustained from the use of a dangerous and explosive instrumentality depends upon proof of negligence and failure to exercise the degree of care required in such cases. See Bennett v. Texas-Illinois Gas Pipeline Co., U.S.Dist.Ct.Ark., 113 F.Supp. 788.

■ Respondent has not denied he was a trespasser, and under the evidence his case will be judged on the assumption that he was a trespasser. Certainly he was no invitee. He was not on railroad property directly or indirectly upon any mission or engaged in any business connected with the interests of the railroad. Lawton v. Little Rock & Ft. S. Ry. Co., 55 Ark. 428, 18 S.W. 543, 15 L.R.A. 434; St. Louis, I. M. & S. Ry. Co. v. Tomlinson, 69 Ark. 489, 64 S.W. 347. He entered the property on his own purely personal business, to ask his father, a section hand, for permission to use his father's truck to take his wife to the doctor. "One who goes upon the premises of a railroad company merely to speak to an employe and not upon any business with the company is a mere licensee." 3 Elliott on Railroads, §

1785, p. 823. The general rule is that a railroad company owes no affirmative duty of care to bare licensees, who take their license with its concomitant perils. Chicago, R. I. & P. Ry. Co. v. Harrison, 204 Ark. 361, 162 S.W.2d 62; St. Louis, I. M. & S. Ry. Co. v. Tomlinson, supra; Arkansas & L. Ry. Co. v. Sain, 90 Ark. 278, 119 S.W. 659, 22 L.R.A.,N.S., 910. " * * * [O]ne who goes upon the premises of another as a mere licensee is in the same attitude as a trespasser so far as concerns the duty which the owner owes him for his protection; that he takes his license with its concomitant perils, and that the owner owes him no duty of protection except to do no act to cause his injury after his presence there is discovered." Knight v. Farmers' & Merchants' Gin Co., 159 Ark. 423, 252 S.W. 30, quoted with approval in Aluminum Company of America v. Walden, 230 Ark. 337, 322 S.W.2d 696. The general rule is that a railroad company owes trespassers no positive duty of care and only the negative duty not to wilfully or wantonly injure them, or the duty to exercise ordinary care not to injure them after discovering their danger and inability to escape.[1] Adams v. St. Louis, I. M. & S. Ry. Co., 83 Ark. 300, 103 S.W. 725; Catlett v. St. Louis, I. M. & S. Ry. Co., 57 Ark. 461, 21 S.W. 1062. The general rule is that those engaged in storing and handling explosive and highly inflammable substances must exercise ordinary care, measured by the nature of the substance handled and the danger, and where such substance is inherently dangerous ordinary care is a much higher degree of care than if it were in its nature innocuous, Phillips Petroleum Co. v. Berry, supra; that " 'in cases of the explosion of dynamite, where third parties having no relation to the person having it in possession are injured * * * the highest degree of care must be exercised.' " Holden v. Carmean, supra, 10 S.W.2d l. c. 866. In the case of trespassing children, if one unnecessarily leaves an explosive exposed and unattended so children may have access to it, at a place where children frequently play, the person who leaves it exposed is liable for injuries to a child who gets possession of it and is injured. In such case it is not error to refuse an instruction that if the child was a trespasser he could not recover. Missouri Pac. R. Co. v. Slatton, supra.

No Arkansas case has been cited or found involving liability to an adult trespasser where the employees of a railroad, with actual knowledge of the presence of the trespasser, injure him by an affirmative act of negligence involving the use of an inherently dangerous explosive. Our task is to ascertain what the Supreme Court of Arkansas would rule under these circumstances. Haberly v. Reardon Co., Mo.Sup., 319 S.W.2d 859. The State of Arkansas was a part of the territory acquired by the Louisiana Purchase from France. It was never subject to the laws of England prior to becoming a member of this Union. Consequently we cannot presume that the common law is in force in Arkansas. In the absence of proof of the Arkansas law under these circumstances, and finding no judicial decisions in Arkansas of which we may take judicial cognizance under Sections 490.080 and 509.220(2), RSMo 1959, V.A.M.S., we must apply our own precedents. Clark v. Barnes, 58 Mo.App. 667; Flato v. Mulhall, 72 Mo. 522.

That plaintiff's status was that of a trespasser is not necessarily controlling; that classification will not control where the facts merit an exception. Wolfson v. Chelist, Mo.Sup., 284 S.W.2d 447, 451. This case falls within two recognized exceptions to the rule of nonliability to trespassers and licensees. (1) Where the presence of a trespasser is discovered the possessor of land is required to exercise ordinary care under the circumstances for

---

[1]. The Arkansas doctrine of discovered peril, which is an exception to the non-liability of landowners to trespassers, has no application for the reasons stated in Arkansas & L. Ry. Co. v. Sain, 90 Ark. 278, 119 S.W. 659, 22 L.R.A.,N.S., 910.

his safety as to any active operations the possessor may carry on. McVicar v. W. R. Arthur & Company, Mo.Sup., 312 S.W.2d 805, and authorities cited, 1. c. 812, 65 A.L.R.2d 785. (2) Where a landowner uses, maintains and handles extremely dangerous explosives he is under a duty to exercise the degree of care which a reasonably careful person would use under the same or similar circumstances, irrespective of the fact that the status of the person may be that of trespasser or licensee. Boyer v. Guidicy Marble, Terrazzo & Tile Co., Mo. Sup., 246 S.W.2d 742, 745; Paisley v. Liebowits, Mo.Sup., 347 S.W.2d 178, 182. While Boyer and Paisley involved persons under 21 years of age, as to whom the duty is especially applicable, this exception is fully applicable to adult trespassers where the activity which a possessor of land carries on upon the land is such that unless carefully carried on it is likely to cause death or serious bodily harm, and he has actual knowledge that a trespasser is on the premises at some point made dangerous by the conduct of the activity. 2 Restatement of the Law of Torts, Negligence, §§ 336, 338. We recognize the duty of a landowner to licensees, in cases involving unusual hazard from explosive material kept on the premises, not to injure him by an affirmative negligent act after his presence is discovered in a position of danger. Anderson v. Cinnamon, 365 Mo. 304, 282 S.W.2d 445, 448, 55 A.L.R.2d 516. The facts in evidence bring the instant case well within these exceptions. Accordingly, plaintiff's status was immaterial and there was no error in overruling appellant's motion for a directed verdict on the ground that plaintiff was a trespasser.

The case was submitted to the jury under the res ipsa loquitur doctrine by Instruction No. 3, which follows:

### "INSTRUCTION NO. 3

"The Court instructs the jury that if you find and believe from the greater weight or preponderance of the evidence that on or about the 26th day of January, 1959, plaintiff was on defendant's premises near the depot in Sylamore, Arkansas, and that defendant's employees were removing and burning trash and personal effects of a deceased scaling gang foreman, Charles Jefferies [sic], in a fire under the control and management of said employees at a bunk car which had been occupied by him, and such items were being burned near where plaintiff was standing, and that while said activities were going on, if you so find, there was an explosion in said fire, which occurred suddenly, violently, and without warning, then you are instructed that such facts (if you believe them to be true) are sufficient circumstantial evidence to warrant a finding by you that the defendant was negligent, and you may do so, unless you find and believe from other facts and circumstances in evidence that the occurrence was not due to defendant's negligence, and, if you do find and believe from all of the evidence in the case that the defendant was negligent and that the plaintiff's injuries, if any, were directly caused by the defendant's negligence, then your verdict should be for the plaintiff and against defendant."

 The doctrine of res ipsa loquitur is a part of the law of evidence, and in determining the application of its principles the law of the forum governs. Alexander v. Inland Steel Co., C.A. 8th Cir., Mo., 263 F.2d 314.

 Citing Venditti v. St. Louis Public Service Co., 360 Mo. 42, 226 S.W.2d 599; Conduitt v. Trenton Gas & Electric Co., 326 Mo. 133, 31 S.W.2d 21; Fuller v. St. Louis Public Service Co., Mo.App., 245 S.W.2d 675 [2]; Cudney v. Midcontinent Airlines, 363 Mo. 922, 254 S.W.2d 662, appellant claims this is not a submissible res ipsa case because plaintiff had knowledge of the cause and demonstrated to the jury the cause of his injury; that he introduced testimony

2. In part overruled in McSkimming v. St. Louis Public Service Co., Mo.App., 257 S.W.2d 176, 179.

covering every conceivable detail of the occurrence and therefore is in no position to invoke a doctrine based upon the superior knowledge of the defendant and the inability of the plaintiff to show the particular circumstances which caused his injuries. Where a plaintiff goes so far in his own evidence as to point out the specific act of negligence which was responsible for his injury, the doctrine of res ipsa loquitur is not applicable; but even though plaintiff's evidence may tend to show the specific cause of the accident, plaintiff will not be deprived of the benefit of the doctrine if, after all of his evidence is in, the true cause of the casualty is still left in doubt or is not clearly shown. Burr v. Kansas City Public Service Co., 365 Mo. 115, 276 S.W.2d 120; White v. St. Louis Public Service Co., 364 Mo. 111, 259 S.W.2d 795. "Submission under the res ipsa loquitur doctrine may not be denied, unless specific negligence, the real or precise cause is definitely shown by direct evidence." Williams v. St. Louis Public Service Co., 363 Mo. 625, 253 S.W.2d 97, 102. The evidence was sufficient for the jury to infer and find that plaintiff's injuries were occasioned by some negligence of appellant. The proof of the explosion in the fire, an unusual event which in the course of human experience would not ordinarily happen in the absence of negligence, and the facts and circumstances leading up to and surrounding the explosion, raised a substantial factual inference which amounted to evidence, and authorized a finding of negligence. True enough, there were several circumstances from which the jury could infer and find specific negligence. An inference could be drawn that someone negligently left dynamite caps in some of the material thrown out. Negligent failure to warn plaintiff, or to cause an inspection of the refuse to be made before allowing it to leave the bunk car, might be inferred. The jury might find an affirmative act of negligence in the act of the employees throwing the refuse into the fire without inspecting it when they should have known or suspected that it contained explosives.

These considerations, however, would not be sufficient to bar plaintiff's use of the res ipsa loquitur doctrine unless his evidence was sufficient to clearly show the specific negligence which caused the injury. White v. St. Louis Public Service Co., supra, 259 S.W.2d, l. c. 799; Williams v. St. Louis Public Service Co., supra. Plaintiff's evidence on this point, circumstantial in nature, does not constitute such a clear and definite showing of what actually happened, or so clearly etch and outline the precise and specific act of negligence that caused plaintiff's injuries, as to exclude all doubt as to the true cause of the occurrence. Plaintiff's proof did not show precisely where the dynamite caps came from, or that they came out of the bunk car, or by whom they were handled, or that they were in the old clothing, shoes or containers thrown onto the fire, or that they were thrown onto the fire. For all that plaintiff's proof showed the caps may have been lying on the ground before the fire was started and the fire may have been started at a spot on the ground where they already were. After plaintiff's testimony was all in, the issue was still in doubt as to where the caps came from, whether they came from the box Henry Jeffery "left in the closet," whether they were transferred from the box to the articles discarded, whether they had been left on the floor, whether they were swept out with the papers, whether they fell onto the ground before or after the fire was started, and how and by whom they were caused to be in the fire. Plaintiff's proof was sufficiently specific to take the case out of the realm of speculation and conjecture, and sufficiently illustrative of the surrounding facts and circumstances to avoid the rule that the mere fact of an explosion, without more, does not bespeak negligence, Carter v. Skelly Oil Co., 363 Mo. 570, 252 S.W.2d 306, and cases cited, l. c. 308, but not so specific as to take the case outside the operation of the res ipsa doctrine.

Appellant objects to the form of Instruction No. 3.

First, it is contended that "the crux of the case" and "the bone of contention" was plaintiff's right and privilege to be present on the railroad property at the time and place of the explosion, and that Instruction No. 3 completely ignored this important issue which consumed a goodly portion of the trial and merely required the jury to find "that plaintiff was on defendant's premises" without regard to plaintiff's right to be there, thereby imposing liability as an insurer on the basis of the formula: "Presence plus explosion equals liability." There was no necessity of submitting the issue of plaintiff's status in the verdict-directing instruction. Under the evidence (that employee Hughes had found and handled dynamite caps in the bunk car, and had anticipated the danger and warned other employees to be on the lookout for more caps; that the employees, familiar with dynamite and the propensities of fire and dynamite caps, threw refuse from the car onto the fire without inspecting it, in the presence of plaintiff whose presence at the fire was known to the railroad employees), plaintiff's status was immaterial; it was appellant's duty to exercise the highest degree of care—the utmost care—to avoid injury to plaintiff, whether plaintiff was an invitee, licensee or trespasser.

Second, appellant objects to the phrase "near the depot," claiming this is positive misdirection and a circumvention of the evidence that the bunk car was in an area where the people of Sylamore did not go, considerably north of the well, which in turn was north of the depot. The particular place where plaintiff was standing in its relation to the pathway and well was not a matter of importance. It related only to the status of plaintiff as a trespasser, and we have decided this case on the assumption that plaintiff *was* a trespasser.

Third, appellant objects that the instruction fails to require that appellant knew or should have known of plaintiff's presence on the railroad property. While knowledge by appellant's employees of plaintiff's presence was a necessary element of plaintiff's case, it was not necessary to submit this factor in Instruction No. 3 because this was not a controverted fact or contested issue. Both sides proved that several railroad employees had actual knowledge of plaintiff's presence at the fire. Those employees who did not happen to see plaintiff before the explosion did not deny that he was there, and one of them did see him afterwards, as indicated. There was no evidence that the presence of plaintiff at the fire at and for several minutes before the explosion was not known to the railroad employees.

Although the question is not raised we observe in passing that there was no necessity to hypothesize the fact that appellant's employees had stored, were dealing with and had been handling dangerous and explosive substances, because appellant has not disputed that this is a case involving the explosion of dynamite caps. On the contrary, at all stages of the trial beyond the pleading stage appellant has accepted this as a fact. By its own witnesses appellant proved that an explosion occurred which sounded like dynamite and that the fragments of metal were pieces of a dynamite cap. In its brief appellant says "On this record, appellee has clearly demonstrated that the cause of the explosion was the casting of dynamite onto the fire."

Next, appellant claims that Instruction No. 9 erroneously submitted the question of plaintiff's lost earnings or wages, past and future; and that there is an overlapping which makes this a "double" damage instruction, in that paragraph 2 directs a verdict for embarrassment and humiliation, and paragraph 3 directs a verdict also for mental anguish, thus authorizing the jury to compensate plaintiff twice for the same element of damages. The measure and elements of damages are controlled, in tort actions, by the law of the place where the tort was committed, since this pertains to the substance of the right and not to the remedy. 25 C.J.S. Damages § 4.

■ Plaintiff testified that before the injury he worked at various jobs, in the timber, for Potosi and Cooper Tie Companies, on a ferry boat, for the railroad, as a cemetery caretaker, at a service station, at General Mills, Carmack Molybdeum Company, and other employments, and that he averaged $35 or $40 a week over a period of time before his injury. Plaintiff testified that after the injury he has hauled freight, once a week, for $10 a load, netting $5 per load after paying expenses; for three weeks he worked for National Silica Sand Company; at harvest time he worked for a milling company, and has worked on the ferry boat, poured cement, and done odd jobs around town; that his average earnings since the injury "over a period of time, averaging them out," have been $25 to $30 a week, or $5 a week less now than they were before, on the average. This is sufficient evidence to sustain that paragraph authorizing the jury to take into consideration "such earnings or wages as you find from the evidence plaintiff has lost to date as a direct result of such injury, if any." Fort Smith Gas Co. v. Lewis, 202 Ark. 427, 150 S.W.2d 622.

■ Paragraph 5 allowed the jury to take into consideration "such earnings or wages as you find from the evidence plaintiff is reasonably certain to suffer, or lose, in the future as a direct result of such injury, if any." Under Missouri Pac. Ry. Co. v. Sorrells, 201 Ark. 748, 146 S.W.2d 704, testimony that a disabling injury is permanent warrants the giving of an instruction permitting the jury to take into consideration "his loss of time from work, if any, by reason of said injury, if any, and his pecuniary loss in the future, if any." There was ample evidence, detailed under the point on excessiveness, infra, that plaintiff suffered a disabling injury which is permanent. Under this evidence paragraph 5 was properly included in Instruction No. 9.

■ With reference to "overlapping" we find no prejudicial error. Plaintiff was entitled to recover "for humiliation and the anguish" on account of the defect in the cornea of his eye, which is visible to others. See Perkins Oil Company of Delaware v. Fitzgerald, 197 Ark. 14, 121 S.W.2d 877. The first paragraph of Instruction No. 9 directed the jury to allow plaintiff such sum as from the evidence would reasonably and fairly compensate him for *all damages* sustained as a direct result of the injury. The items following, which the jury were allowed to "take into consideration in considering and determining the amount of such sum," related to the damages correctly directed in the first paragraph. We do not believe the jury would understand from the instruction that they could allow a double recovery for this element of damage. While it is better practice to submit general and uncomplicated damage instructions, leaving the details to jury argument, Moss v. Mindlin's, Inc., Mo.Sup., 301 S.W.2d 761, we cannot conclude that appellant was prejudiced in this submission.

Finally, the issue of excessiveness is raised. Charles L. Stevens, when injured, was a 24-year-old married man with an eighth grade education, and no special training for skilled work. He was a common laborer who had worked at many different jobs. His earning capacity was small. During the past 10 years he had earned $10,000, an average of $1,000 a year. His life expectancy was 45.6 years. Without special skills, it was of unusual importance to him that his physical faculties, and especially his eyesight, remain unimpaired. He had no previous trouble with his eyesight. Prior to the accident he spent considerable time fishing and hunting. He was a good shot with a rifle. When the explosion occurred a round fragment of copper about the size of a black-eyed pea, lodged in his knee. This was removed. The knee healed and gives him no present difficulty. He received a painful injury to his right eye. At the hospital the doctor removed from the center of the cornea a small piece of metal about one sixteenth of

an inch in size. When the bandage was removed two weeks later "there was just a blind spot on everything, just a dark spot on all I looked at, and it was just dim." There has been no improvement. There is still a dark spot in the center of whatever he looks at, when he looks straight at an object. His peripheral vision is not impaired, but whichever way his eyes turn, a long-shaped dark spot remains in the center of his vision. It gives him the most trouble at reading arm's length. When he brings something up close to him it "all runs together." This bothers him when he is gigging fish; he cannot "get a good look at the fish to hit it." He can no longer use a rifle, because he cannot see the bead on the end of the barrel. He can see the target with his good eye, but when he brings the gun to his shoulder he cannot find either gun sight or target. He has given up hunting with a rifle, and shooting a pistol. It bothers him in walking and driving. He has lost his depth perception. Everything looks flat. Now he steps higher than normal because he cannot judge the height of "step ups and step downs." He cannot judge distance of holes in the pathway, or chugholes in the street, or the distance of a car or a taillight. Things blur. It bothers him in chopping wood and in reaching for objects. He cannot pour water from one thing to another; he "overshoots" it. This condition causes him worry and concern, as well as embarrassment. He doesn't like for people to know about his disability, but "they see it." This is a permanent condition which he will have every waking hour during the rest of his life. He has pain behind his eyeball, "and around, and hurts in [his] forehead" over his right eye. This interferes with his ability to read. "I just can't read it, it's blurred, and it's got that spot on it, and I can't see it." It worries him about getting a job. "Nobody will hire me. Have to take an eye test. * * * I got a family to feed. * * * And I can't do it setting at the house; I got to get out and do something." He cannot drive farm vehicles, tractors, etc. He would have dif-

ficulty working in a machine shop because he cannot tell how close he is to an object. His work will be limited. Examining optometrists for industry would "steer him clear" of a job requiring distance judging. This difficulty with respect to employability is permanent. The medical evidence favorable to plaintiff's case: He has a slight corneal scar, centrally located, on the right eye, "right in the center of the bull's eye." As the eyeball moves the scar moves with it, regardless of which direction he looks. He has impaired vision of that eye because the scar interferes with vision straight ahead, and causes blurred images,—the cornea is opaque instead of transparent. There is no lens that could focus light and assist in passing light through the opaque scar tissue. Light rays falling on the scar tissue reflect away from their normal path. Instead of normal 20–20 vision plaintiff's vision is blocked out centrally down to a 20–60 letter. The use of eyeglasses would not improve his vision in the right eye. He can see how many fingers he has, and can see any movement to the side (peripheral vision) but when he looks at an object he cannot see it distinctly. He sees a shadow of an image. He cannot perceive detail. He has lost the third dimension, or depth perception, and distance perception. With one eye everything looks flat. The scar is permanent. The condition will not improve. If there is any change it will be for the scar to grow thicker. There is no damage to the optic nerve, no evidence of inner ocular disease, and no internal hemorrhage of the eye. His special damages are small, totaling $70 for doctor bills, and $218 for hospital bills. His loss of wages in the past has been $5 per week.

■ Whether to cure the error of an excessive verdict by enforced remittitur is a procedural problem governed by the law of the forum. Joice v. Missouri-Kansas-Texas R. Co., 354 Mo. 439, 189 S.W.2d 568, 576, 161 A.L.R. 383. Appellant cites Higgins v. Terminal R. R. Ass'n of St. Louis, (1951), 362 Mo. 264, 241 S.W.2d 380; O'Brien v.

**134**

Louisville & Nashville R. Co., (1950), 360 Mo. 229, 227 S.W.2d 690; Meierotto v. Thompson, (1947), 356 Mo. 32, 201 S.W.2d 161 and Cunningham v. Doe Run Lead Co., (1930), Mo.Sup., 26 S.W.2d 957. We have considered these cases, and many other Missouri decisions, including Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W. 2d 693, 34 A.L.R.2d 972; Honeycutt v. Wabash Railroad Co., Mo.Sup., 337 S.W. 2d 50, as well as recent cases of comparable injuries and ages in other jurisdictions, of which Jay v. Walla Walla College, (1959), 53 Wash.2d 590, 335 P.2d 458 (approving an award of $27,303 for a college student who suffered injuries to the retina of his left eye from flying glass necessitating surgery) and Rubin v. Thos. A. Corwin, Inc., (1961), 13 A.D.2d 538, 213 N.Y.S.2d 541, (reducing a verdict of $37,500 to $27,500 for a public school teacher who was injured when metal chips struck him in the eye), are examples. Honeycutt v. Wabash R. Co., supra, is of particular value. In that case, decided in 1960, we left undisturbed a $20,000 verdict for a 35-year-old man who received an injury near the eye as a result of which he suffered from severe headaches three to five times a week for years, a permanent condition; inability to read newspapers, view television, or engage in similar activities without causing headaches and eye pain; inability to stoop, bend or raise up as formerly without triggering headaches, and who was obliged to give up playing baseball with his children, joining them in scout activities, and playing cards with his family and friends.

Having in mind both the similarities and the differences between these cases and the instant case in the nature and extent of the injuries, the existence and permanence of the disability, the special damages sustained, the earnings lost and to be lost, the differing capacities to earn, ages and life expectancies, the pain, suffering and mental distress involved, the varying purchasing power of the dollar at the times these cases were decided, the rule of reasonable uniformity, the fact that the trial court did not cut the verdict, and all of the several other factors which must be weighed, we are of the opinion that the judgment is excessive by $7,000 and that the maximum amount for which a judgment should be permitted to stand is $20,000. If, within 15 days after the filing of this opinion, plaintiff will enter here a remittitur of $7,000, the judgment will stand affirmed in the sum of $20,000, as of the date of the original judgment. Otherwise, the judgment will be reversed and the cause remanded for a new trial.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.